RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ELIZABETH A. OSBORN (16-2221 & 16-6225); LINDA G. HOLT, JUDITH E. PREWITT, and CYNTHIA L. ROEDER (16-2221/6225/6226/6227),

        *Plaintiffs-Appellees*,

    *v.*

JOHN M. GRIFFIN, ESTATE OF DENNIS B. GRIFFIN, and DENNIS B. GRIFFIN REVOCABLE TRUST - 2012 (16-6221 & 16-6226); MARTOM PROPERTIES, LLC (16-6225 & 16-6227),

        *Defendants-Appellants*.

Nos. 16-6221/6225/6226/6227

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 2:11-cv-00089; 2:13-cv-00032—William O. Bertelsman, District Judge.

Argued: April 27, 2017

Decided and Filed: July 28, 2017

Before: MERRITT, BATCHELDER, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gregory G. Garre, LATHAM & WATKINS LLP, Washington, D.C., for Appellants. Janet P. Jakubowicz, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellee Osborn. Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellees Holt, Prewitt, and Roeder. **ON BRIEF:** Gregory G. Garre, Melissa Arbus Sherry, Benjamin W. Snyder, Matthew J. Glover, LATHAM & WATKINS LLP, Washington, D.C., Heather A. Waller, LATHAM & WATKINS LLP, Chicago, Illinois, for Griffin Appellants. Joseph M. Callow, Jr., Thomas F. Hankinson, Jacob D. Rhode, KEATING MUETHING & KLEKAMP PLL, Cincinnati, Ohio, for Martom Appellant. Janet P. Jakubowicz, Benjamin J. Lewis, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellee Osborn. Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC,

Louisville, Kentucky, Eva Christine Trout, TROUT LAW OFFICE PLLC, Lexington, Kentucky for Appellees Holt, Prewitt, and Roeder.

CLAY, J., delivered the opinion of the court in which BATCHELDER, J., joined. MERRITT, J. (pp. 56–65), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Defendants John M. Griffin, the Estate of Dennis B. Griffin, the Dennis B. Griffin Revocable Trust, and Martom Properties, LLC ("Defendants"), appeal from the judgment entered by the district court on April 26, 2016, requiring Defendants to pay roughly $584 million in wrongful profits disgorgement and prejudgment interest to Plaintiffs Elizabeth A. Osborn, Linda G. Holt, Judith E. Prewitt, and Cynthia L. Roeder ("Plaintiffs").  Plaintiffs, four sisters, essentially allege that Defendants, two of their brothers and a related entity called Martom Properties, cheated them out of stock and real property related to the family's business that they should have inherited under the terms of their parents' estate plans.  The district court agreed with Plaintiffs after a bench trial, finding that Defendants' conduct in managing the family business and their parents' estates and trusts violated their fiduciary duties to Plaintiffs under Kentucky law.  Defendants appeal, raising a litany of challenges to the district court's jurisdiction, legal conclusions, remedy, and decision to conduct a bench trial.  The district court exercised subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, we **AFFIRM** the district court's judgment.

**BACKGROUND**

I.     **Factual History**

A.     **Parties and Other Griffin Family Members**

This litigation concerns a multi-million dollar inheritance dispute among the children of John L. Griffin ("John"), a long-deceased Kentucky businessman.  During his lifetime, John and his wife Rosellen Griffin ("Rosellen") had twelve children.  Plaintiffs are four of the couple's

daughters: Elizabeth Osborn, Linda Holt, Cynthia Roeder ("Cyndi"), and Judith Prewitt ("Judy").  *Id.*  Mirroring the parties and the district court, we refer to Elizabeth Osborn as "Betsy," and the remaining three sisters as the "*Holt* Plaintiffs."

Defendants are, in effect, two of John and Rosellen's sons—Dennis B. Griffin[1] and John M. Griffin ("Griffy")—plus an entity they created called Martom Properties, LLC ("Martom").

The Griffins were a patriarchal family.  "The Griffin children were taught that the older siblings were in charge and that the younger siblings had to respect them."  (R. 856, Findings of Fact and Conclusions of Law, ¶ 4.)  In practical effect, this meant that Dennis and Griffy—the eldest brothers—wielded the respect of and exercised authority over the younger children, including Plaintiffs.

## B.    Griffin Industries

In 1943, John founded Griffin Industries, a rendering company that primarily hauls away animal carcasses and other waste and converts this material into useful products.  Griffin Industries was a family business in the truest sense of the term.  "All [of] the Griffin children worked in the business after school and in summers, with the girls doing primarily office work and the boys working in the plants."  (*Id.* ¶ 5.)  "When the girls married, their husbands usually worked in the company."  (*Id.*)  Over the second half of the twentieth century, Griffin Industries grew into a prosperous enterprise with operations in several states.  Eventually, when the children were all adults, four of them (including Dennis and Griffy) worked full-time at Griffin Industries, while the others did not.

In the 1960s and 1970s, John purchased several real estate parcels in Kentucky that were used by Griffin Industries in its operations.  These properties were titled in John's name.  In 1981, Griffin Industries purchased Craig Protein, another rendering company based in Georgia.  John personally held 1,000 shares of Craig Protein stock.  At its core, this dispute concerns the ownership of: (i) John and Rosellen's Griffin Industries stock; (ii) John's real estate; and (iii) John's Craig Protein stock.

---

[1]Dennis died in 2015, and his estate and trust were substituted as defendants in his place.  For simplicity's sake, we refer to Dennis' estate and trust as "Dennis."

**C.      John's and Rosellen's 1967 Estate Plans**

In 1967, both John and Rosellen prepared separate wills and revocable trusts. Rosellen's will specified that when she died, all of her Griffin Industries stock would pass first to John, and then to her trust (along with the remainder of the residue of her estate). Rosellen named the First National Bank of Cincinnati (later known as Star Bank) as her trustee, and her trust instruments provided that all assets of the trust would be divided among her eleven then-living children.

The district court described John's estate plan as follows:

[John] executed a Last Will and Testament in 1967, which provided that all his chattel property would pass to [Rosellen] and, if she predeceased him, to his eleven children in equal amounts. A first codicil in 1967 bequeathed his stock to [Rosellen], then to his 1967 Trust if she predeceased him. [John's] second codicil, executed in 1974, bequeathed his stock to [Rosellen], with the stock to be purchased by Griffin Industries if she predeceased him. In 1974, [John] executed a third codicil changing his alternate beneficiary to his children, equally. In 1975, [John] executed a fourth codicil that left his stock to [Rosellen], except for any stock purchased by Griffin Industries. If [Rosellen] predeceased [him], then the stock would be distributed equally to his children. A fifth codicil was executed in 1981 that made no changes to the distribution of the stock.

[John] also created a Trust in 1967 which, under a First Amendment executed on October 2, 1978, provided that its assets would be distributed among seven of the children when they turned thirty (or, if deceased, their living issue, if any): Cyndi, Marty, Tommy, Linda, Judy, Janet, and Betsy. These children were the seven who were not then working full-time for Griffin Industries. A further amendment in 1981 did not alter the distribution of the trust's assets.

(*Id.* ¶¶ 11–12.)

In sum, from the late 1960s to the early 1980s, both John's and Rosellen's respective estate plans expressed a clear and consistent desire to bequeath their property equally to their eleven living children. There was only one deviation from this intention. In the early 1980s, John recognized that because Griffin Industries was a Subchapter S corporation, "the four working children were receiving more income from Griffin Industries tha[n] the seven non-working children." (*Id.* ¶ 13.) John wanted to "adjust this result" by making additional stock gifts to the non-working children to restore equality amongst his heirs. (*Id.*) John's intention was that if Rosellen predeceased him, "the non-working children would end up with more shares

than the working children" to account for the fact that the working children received direct income from Griffin Industries. (*Id.* ¶ 14.)

### D.    Disputed Griffin Industries Stock Transactions

The events that gave rise to this lawsuit began in the mid-1980s. In 1983, John suffered a massive stroke that left him partially paralyzed and unable to speak, write, care for himself, drive, or walk without assistance. After the stroke, John had a functional IQ of 67, and the mental age of an eight-year-old. Dennis recognized his father's infirmity, and told one of his sisters to not let John "sign anything because you know he doesn't understand." (*Id.* ¶ 23.)

Exacerbating the family upheaval, Rosellen died in 1985 of Parkinson's disease. At the time of Rosellen's death, she owned roughly 13% of Griffin Industries' stock. In accordance with the terms of her estate plan, her stock passed to John, who owned roughly 53% of Griffin Industries' stock, giving him a combined total of 66% of the company.

In September 1985, Dennis and Griffy successfully petitioned a Kentucky probate court to: (i) make them executors of Rosellen's estate; and (ii) give them power of attorney over John. On November 14, 1985, John executed a Third Amendment to his 1967 Trust that made Dennis and Griffy his trustees. Four days later, he transferred his 53% of Griffin Industries' stock to his trust.

Dennis and Griffy then effectuated the following elaborate series of stock transactions using their authority as trustees of John's trust and executors of Rosellen's estate:

- John's six sons (but none of his daughters) purchased all of Rosellen's Griffin Industries shares;
- John's trust sold 5% of his shares to his grandchildren's trusts, who in turn gave his six sons (but none of his daughters) the opportunity to buy-back the shares at 60% of their value;
- John disclaimed all interest in the shares Rosellen had left to him;
- John's six sons purchased all of the remaining Griffin Industries shares in John's trust.

The net result of these machinations was that the six sons obtained ownership of all of John and Rosellen's shares, while the daughters received no stock beyond what they already owned

through various gifts in the 1960s and 1970s.  The sons thereafter controlled roughly 87% of Griffin Industries' stock.

After planning these maneuvers, Dennis called a pair of family meetings in November 1985 to discuss his mother's estate.  At the meetings, Dennis lied to his siblings by claiming that Griffin Industries was on the verge of bankruptcy (it was actually profitable), and that their parents' estate plans called for the six sons to own all of the parents' Griffin Industries stock.  Dennis did not show any of his sisters his mother's estate or trust documents, and when one of the sisters (Linda) tried to ask about her mother's will, Dennis told her "to shut up and sit down." (*Id.* ¶ 40.)  Reflecting the patriarchal nature of the family, Plaintiffs trusted and "relied on Dennis and Griffy to handle their parents' estate matters."  (*Id.* ¶ 45.)

On two subsequent occasions, Linda visited Dennis and asked to view Rosellen's estate documents.  Each time, Dennis became angry and abusive, and refused to show her the relevant documents.

### E.    Betsy's 1990 Lawsuit

One of the sisters—Betsy—proved more insistent than Linda.  In the late 1980s, she learned that Dennis planned to transfer some of the Griffin Industries stock to his children.  When Betsy asked Dennis how he had the legal authority to do this, Dennis became angry "and told her that stock 'didn't concern' her."  (*Id.* ¶ 67.)  When Betsy asked Griffy about the transfers, he lied, telling Betsy that he was not familiar with Rosellen's estate plan, and "that if she didn't like what [Dennis and Griffy] were doing, she should 'sue them.'"  (*Id.*)

On January 20, 1990, Betsy wrote a letter to Dennis and Griffy informing them that she had read their mother's will, and that under the will's terms she was entitled to one-eleventh of Rosellen's Griffin Industries stock.  None of the *Holt* Plaintiffs saw or reviewed this letter.

After Dennis and Griffy rebuffed her, Betsy filed a federal lawsuit against Dennis and Griffy in the Eastern District of Kentucky.  The suit challenged Dennis and Griffy's 1986 stock machinations, and also asserted a derivative claim on behalf of all Griffin Industries shareholders (nominally including the *Holt* Plaintiffs).

Dennis responded to the suit by berating Betsy in front of her family members, alleging that the suit had no merit and was purely motivated by greed.  Dennis told the *Holt* Plaintiffs that the suit did not involve them, and declined to give any details about the nature of the suit.  The *Holt* Plaintiffs believed what Dennis told them about Betsy and the suit, and stopped speaking with Betsy until the mid-2000s.  Prior to the present lawsuit, the *Holt* Plaintiffs never learned the nature of or participated in that suit.

On November 30, 1991, John executed both a Sixth Codicil to his will ("Sixth Codicil"), and a Fourth Amendment to his trust ("Fourth Amendment"), both of which: (i) retroactively approved Dennis and Griffy's 1986 stock transactions; and (ii) provided that the remainder of John's property would be split equally by his five living daughters upon his death.  These estate changes came shortly after John underwent a doctor's examination which revealed his low functional IQ and mental age.  On January 20, 1992, John purportedly executed an affidavit which also retroactively approved Dennis and Griffy's stock sales.

Eventually, in 1993, Betsy negotiated a settlement agreement with Dennis and Griffy that gave her a large number of Griffin Industries shares, plus roughly $100,000 to cover past distributions.  However, because there was an outstanding derivative claim, Dennis and Griffy were required to separately settle with the other Griffin Industries shareholders, including the *Holt* Plaintiffs.  Dennis called the *Holt* Plaintiffs into his office and ordered them to sign a document.  He did not explain that the document was a settlement agreement, and when Cyndi asked if she could read it, Dennis refused.  The *Holt* Plaintiffs executed a final settlement with Dennis and Griffy on September 10, 1993 that settled their derivative claims and released all possible tort claims against Dennis and Griffy for $10,000.  Dennis lied to the *Holt* Plaintiffs and told them that they had received as much compensation as Betsy received for her claims, and that Betsy got "very damn little" from the 1990 lawsuit.  (*Id.* ¶ 112.)  The *Holt* Plaintiffs were never told the terms of Betsy's settlement.

F.    **Disputed Real Estate and Craig Protein Stock Sales**

John died on April 9, 1995, and Dennis and Griffy became the executors of his estate.  At the time of his death, John's estate still possessed the Craig Protein stock (the Georgia company

John bought in 1981), as well as the real estate assets he purchased before his stroke.  In accordance with the terms of John's Sixth Codicil and Fourth Amendment, these assets should have been divided equally amongst his five daughters.  Nevertheless, Dennis and Griffy sought legal advice about how to acquire this property without either obtaining the prior consent of their sisters, or violating Kentucky's prohibition against self-dealing by fiduciaries.

Eventually, Dennis and Griffy settled on the following plan: First, they directed two of their younger brothers ("Marty" and "Tommy") to buy the Craig Protein stock at a substantially undervalued price.  Later, in 2002, Marty and Tommy traded the Craig Protein stock back to Griffin Industries in exchange for Griffin Industries stock.  The Griffin Industries stock they acquired netted them more than $30 million in distributions over the succeeding years.  Dennis and Griffy never offered their sisters the opportunity to buy the Craig Protein stock, because they wanted the stock to remain in the hands of their brothers.

Dennis and Griffy then created a new corporation, Defendant Martom,[2] which purchased all of John's real estate, and then leased the property back to Griffin Industries.  Although Dennis and Griffy owned no shares in Martom, they effectively controlled Martom through their ownership of Griffin Industries, as Martom had no employees of its own and was staffed entirely by Griffin Industries personnel.  Marty and Tommy—Martom's owners—each testified that they exercised virtually no management or control over Martom.

The net result of these transactions was that Dennis and Griffy maintained effective control and ownership over all of the Craig Protein stock and Martom real estate.  "The proceeds from the sale of the Craig Protein stock to Marty and Tommy and the real properties to Martom were paid into [John's] estate and Trust and were distributed to the five sisters equally."  (*Id.* ¶ 142.)  Thus, although the sisters received the proceeds of these transactions, they never had the opportunity to take the stock or real-estate in-kind—something that wound up costing them millions of dollars.

---

[2]Martom is a mashup of the names Marty and Tommy.

**G.      Genesis of This Litigation**

Griffin Industries prospered greatly throughout the 1990s and 2000s.  In 2010, Griffin Industries was purchased by a company called Darling International for $840 million.  While the merger was closing, Cyndi was mistakenly faxed a document listing Griffin Industries' shareholders and detailing the amount of stock each shareholder owned.  Cyndi was shocked to discover that she and her other sisters owned substantially less stock in the company than their brothers (as well as Betsy, due to the 1993 settlement).

During the due diligence for the merger, Griffy became aware that he and Dennis had forgotten to transfer one of their father's properties ("Cold Spring") to Martom during their 1995 real estate transactions.  Using his power as John's trustee, he conveyed the overlooked real estate parcel to Griffin Industries for $1.

Betsy learned of Griffy's Cold Spring transaction, and on April 27, 2011, filed suit against Dennis and Griffy in the Eastern District of Kentucky.  Betsy spoke to Linda, Judy, and Cyndi about Dennis and Griffy's various self-dealing transactions at a Christmas party in December of 2011.  After learning why they possessed so little Griffin Industries stock, Linda, Judy, and Cyndi filed their own lawsuit in the Eastern District of Kentucky on March 8, 2013.  The *Holt* Plaintiffs' suit alleged various state and federal law causes of action against Dennis, Griffy, and Martom.  Betsy and the *Holt* Plaintiffs' respective lawsuits were consolidated into the instant action.

**II.      Procedural History**

Because the district court record is particularly voluminous, we will summarize the proceedings below.

Following initial motion practice and extensive discovery, the parties filed several cross-motions for summary judgment.  After hearing oral argument on the various motions, the district court issued a summary judgment order on September 29, 2014.  *Osborn v. Griffin*, 50 F. Supp. 3d 772 (E.D. Ky. 2014).

In its summary judgment order, the district court dismissed all of Plaintiffs' various state and federal claims except for their claims for breach of fiduciary duties under Kentucky law; however, the district court largely found in Plaintiffs' favor with respect to the fiduciary duty claims. The district court concluded that there were genuine disputes of material fact as to whether Dennis and Griffy breached their fiduciary duties with respect to the 1986 stock transactions. *Id.* at 794–97. The district court further determined that there was *no* genuine dispute of material fact that Defendants breached their fiduciary duties with respect to: (i) the Craig Protein stock sale; (ii) the Martom real estate conveyances; and (iii) Griffy's decision to convey the Cold Spring property to Griffin Industries for $1 dollar in connection with the 2010 merger. *Id.* at 800–03. The district court determined that the only triable issues with respect to these claims were on Defendants' various affirmative defenses. *Id.*

The parties then proceeded to a bench trial. On March 21, 2016, the district court issued findings of fact and conclusions of law that rejected each of Defendants' affirmative defenses and held Defendants liable for breaches of fiduciary duties. In essence, the district court found that all of the disputed stock sales and real estate conveyances were self-dealing transactions in violation of Defendants' fiduciary duties and Kentucky law. The district court further found that Defendants had abused their position of trust with their sisters and covered up their misdeeds to prevent the sisters from learning of their claims. The court determined that under Kentucky law, this abuse of trust excused Plaintiffs' failure to bring their claims within the applicable statute of limitations. Finally, the district court accepted the testimony and methodology of Plaintiffs' damages expert, finding his reasoning sound, and noted that Defendants had failed to offer their own expert to contradict his testimony.

The district court entered judgment on April 26, 2016, awarding Plaintiffs roughly $584 million in equitable disgorgement of wrongful profits and prejudgment interest. This award consisted of: (i) $10,355,925 to each Plaintiff stemming from Defendants' Craig Protein stock sales, including prejudgment interest running from May 1995 until April 2016; (ii) $1,959,397 to each Plaintiff stemming from Defendants' Martom real estate sales, including prejudgment interest running from July 1995 until April 2016; and (iii) $178,128,949 to each of the *Holt* Plaintiffs stemming from Defendants' illicit Griffin Industries stock transactions, including

prejudgment interest running from January 1986 until April 2016. Defendants were held jointly and severally liable for the entire award, and the award assessed prejudgment interest at a rate of 8% compounded annually.

After post-trial motion practice did not alter the district court's judgment, Defendants filed timely notices of appeal.

## DISCUSSION

### I.     Subject Matter Jurisdiction

#### A.     Standard of Review

"We review de novo the existence of subject-matter jurisdiction." *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016).

#### B.     Probate Exception

The district court originally asserted federal question jurisdiction over this dispute because Plaintiffs alleged a federal RICO claim. *See* 18 U.S.C. § 1962, 1964(c). However, the district court granted summary judgment dismissing the RICO claim, leaving only Kentucky tort claims for breach of fiduciary duties. *Osborn*, 50 F. Supp. 3d at 809. The district court asserted supplemental jurisdiction over these remaining state law claims pursuant to 28 U.S.C. § 1367(a). This use of § 1367(a) was proper because the state law claims were part of the same Article III case or controversy as the federal RICO claim, and the parties do not argue otherwise. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).

Where the parties disagree is whether the district court was divested of subject matter jurisdiction by the so-called "probate exception" to federal jurisdiction. Under the probate exception, federal courts are prohibited from exercising jurisdiction over certain conflicts involving property subject to a state court probate proceeding. *See generally* Charles A. Wright & Arthur R. Miller, et al., 13E *Federal Practice and Procedure* § 3610 (3d ed. 2017 supp.).

The Supreme Court has held that this exception is "of distinctly limited scope." *Marshall v. Marshall*, 547 U.S. 293, 310 (2006). The exception is "essentially a reiteration of the general

principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Id.* at 311. It "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* at 311–12. Thus, the probate exception generally does not apply when a plaintiff: (i) "seeks an *in personam* judgment against [the defendant], not the probate or annulment of a will;" and (ii) does not "seek to reach a *res* in the custody of a state court." *Id.* at 312.

We have further limited the probate exception's reach. In *Wisecarver v. Moore*, we held "that causes of action alleging breach of fiduciary duties . . . do not necessarily fall within the scope of the probate exception." 489 F.3d 747, 751 (6th Cir. 2007) (collecting cases). We reasoned that "the principles underlying the probate exception are not implicated when federal courts exercise jurisdiction over claims seeking *in personam* jurisdiction based upon tort liability because the claims do not interfere with the *res* in the state court probate proceedings or ask a federal court to probate or annul a will." *Id.*

We then distinguished the sorts of remedies implicated by the probate exception from the remedies outside of its reach. We held that the probate exception bars a plaintiff from seeking: "(1) an order enjoining Defendants' disposition of assets received from [the decedent's] estate, (2) an order divesting Defendants of all property retained by them [from the estate] . . . and (3) a declaration that [the decedent's] probated will be declared invalid[.]" *Id.* We also held that the probate exception bars a plaintiff from seeking "money damages equal to the amount of the probate disbursements[.]" *Id.* n.1. We reasoned that granting such relief "is precisely what the probate exception prohibits because it would require the district court to dispose of property in a manner inconsistent with the state probate court's distribution of the assets." *Id.* at 751. However, we further held that plaintiffs may, without implicating the probate exception: (i) challenge *inter vivos* transfers; and (ii) seek disgorgement of monies improperly removed from the decedent's estate during his or her lifetime. *Id.*

Defendants argue that the district court should have invoked the probate exception and declined to hear this case because: (i) Plaintiffs sought money damages equal to the value of the property probated pursuant to John's will, violating *Wisecarver*; and (ii) the 1986 Griffin Industries stock sales were ratified in John's will, and therefore Plaintiffs' claims challenging those sales necessarily sought to invalidate the will.

We disagree, for several reasons.  First, we note that John's Griffin Industries stock was not part of any *res* distributed by a probate court.  The October 20, 1995 Inventory and Appraisement Form prepared by Dennis and Griffy for John's probate proceedings shows that John's estate did not hold any Griffin Industries stock at the time of his death.  As we have recounted, John did not possess this stock in 1995 because Dennis and Griffy transferred it out of his estate in the mid-1980s.

We thus agree with the district court that, with respect to John's Griffin Industries stock, Plaintiffs sought and obtained "compensation for the value of property allegedly wrongfully transferred *out of* their father's estate by [D]efendants in breach of their fiduciary duties." (R. 612, PageID #28041 (emphasis added, footnote omitted).)  We have expressly held that such relief does not implicate the probate exception.  *See Wisecarver*, 489 F.3d at 751 (holding that "the removal of [contested] assets from [the decedent's] estate during his lifetime removes them from the limited scope of the probate exception").  The reasoning for this rule is simple: property that a party *removes* from a decedent's estate prior to his death is not part of the *res* that is distributed by the probate court.  Thus, ordering a defendant to disgorge the profits acquired from such property does not require either setting aside the decedent's will, or redistributing assets that were parceled out by the probate court.

That John's Sixth Codicil and Fourth Amendment—which purported to ratify Dennis and Griffy's 1986 stock transactions—were included in the estate documents submitted to the probate court does not change this analysis.  The mere fact that assets are tangentially mentioned in probated estate and trust documents is irrelevant.  *See Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 108 (2d Cir. 2007) (After *Marshall*, the "probate exception can no longer be used to dismiss widely recognized torts such as breach of fiduciary duty . . . merely because the issues intertwine with claims proceeding in state court." (citation, quotation marks, and alteration omitted)).

Federal jurisdiction is only destroyed when a plaintiff seeks to set aside a will or appropriate assets that were distributed by a probate court (or their cash equivalents). *Marshall*, 547 U.S. at 311–12; *Wisecarver*, 489 F.3d at 751 n.1. Accepting Defendants' arguments and dismissing this suit because Plaintiffs sought the value of assets that Defendants *took out* of John's estate merely because those assets were mentioned in John's estate plan would require expanding the probate exception beyond its "distinctly limited scope." *Marshall*, 547 U.S. at 310.

Second, with respect to Rosellen's Griffin Industries stock, John's Craig Protein stock, and the real estate acquired by Martom, the district court correctly found that Plaintiffs did not "seek money damages equal to the amount of the probate disbursements." *Wisecarver*, 489 F.3d at 751 n.1. Rather, the district court ordered Defendants to disgorge the profits they obtained from their wrongful conduct, and used those funds to compensate their sisters—the victims of Defendants' scheme. These wrongful profits were significantly greater than the value of John and Rosellen's assets at the time their estates were probated, confirming that the district court's monetary award was not just a proxy for the value of probated assets. *See S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (explaining that a "district court order of disgorgement forces a defendant to account for all profits reaped through his [wrongful conduct] and to transfer all such money to the court, even if it exceeds actual damages to victims"); *see also id.* ("Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation . . . .").

While the probate exception prevents a federal court from *de facto* redistributing probated property by granting a plaintiff its equivalent cash value, *Wisecarver*, 489 F.3d at 751 n.1, it does not prevent a court from disgorging the profits that a defendant obtains through his wrongful possession of such property. Thus, for example, if a defendant forges a will to bequeath himself a lottery ticket worth $1 dollar, and obtains the ticket through probate proceedings, a federal court can neither set aside the will, nor order the defendant to pay a plaintiff $1 in compensatory damages. But, if the defendant wins the lottery, a federal court *can* use any equitable authority it possesses under the relevant substantive law it is applying to force the defendant to disgorge his lottery winnings. The probate exception is narrowly focused on preventing federal courts from

upending probate proceedings; any profits a defendant may obtain after acquiring probated assets are "matters outside [its] confines." *Marshall*, 547 U.S. at 311–12.

Third, none of the relief sought by Plaintiffs required invalidating John's will. Plaintiffs do not argue that the will should be set aside; they merely argue that the will was not sufficient to ratify Defendants' breaches of their fiduciary duties under Kentucky law. Put differently, Plaintiffs accept (as they must) the validity of John's will, but argue that the will is insufficient proof that John intended to ratify Defendants' wrongful conduct. This distinction is decisive, as federal courts are only prohibited from setting aside a will, and not from determining its *legal effect* on an affirmative defense. *Id.*; *see also Markham v. Allen*, 326 U.S. 490, 494 (1946) (holding that the probate exception does not prevent a federal court from exercising "its jurisdiction to adjudicate rights in [probated] property where the final judgment does not undertake to interfere with the state court's possession").

In sum, the probate exception does not apply here because Plaintiffs: (i) sought "an *in personam* judgment against [Defendants], not the probate or annulment of a will;" and (ii) did not "seek to reach a *res* in the custody of a state court." *Marshall*, 547 U.S. at 311. We therefore hold that the district court properly exercised subject matter jurisdiction over this dispute.

## II.      Challenges to Liability

### A.      Standard of Review

On an appeal from a judgment entered after a bench trial, we review the district court's legal conclusions *de novo*, and its factual findings for clear error. *Moorer v. Baptists Mem. Health Care Sys.*, 398 F.3d 469, 478–79 (6th Cir. 2005); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448 (6th Cir. 2002); *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999). "A 'finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Atkins*, 843 F.3d 625, 632 (6th Cir. 2016) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "Under this standard, if 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of

appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson*, 470 U.S. at 573–74).

**B.     Statute of Limitations**

Kentucky has a five-year statute of limitations for breach of fiduciary duty claims. *See* Ky. Rev. Stat. § 413.120(2), (6). Neither party disputes that all of Defendants' breaches of their fiduciary duties occurred in the 1980s and 1990s—more than five years before these consolidated lawsuits were filed in 2011 and 2013, respectively. However, Kentucky equitably tolls its statute of limitations whenever the defendant's wrongful conduct prevents a plaintiff from discovering her claims. Ky. Rev. Stat. § 413.190(2). The parties dispute the applicability of this tolling provision.

Before we discuss the parties' arguments, it is helpful to separate out the district court findings that are not at issue in this appeal. The district court found that Plaintiffs should have discovered their claims through the exercise of reasonable diligence by the early 1990s. *Osborn*, 50 F. Supp. 3d at 806–08. The district court also found that Defendants failed to "disclose all the material facts regarding [their] handling of their parents' estate plans or their fiduciary breaches" despite having "an affirmative duty to make full disclosures to their sisters[.]" (R. 856, ¶ 213.) Neither party challenges these findings, although as we discuss later, Defendants deny having had any fiduciary duties to Plaintiffs.

Instead, the parties' statute of limitations dispute is cabined to a single legal issue: when a defendant violates his fiduciary duties to a plaintiff by failing to disclose facts relevant to the plaintiff's cause of action, does the statute of limitations run from the time when the plaintiff should have known about the breach, or the time when the plaintiff actually learns about the breach? Defendants argue that the limitations period began running when Plaintiffs should have learned about their claims in the early 1990s, and therefore assert that the claims are time-barred. Plaintiffs argue, and the district court concluded, that the limitations period began running in 2010 when Plaintiffs actually learned about Defendants' wrongful conduct. We agree with Plaintiffs and the district court.

Kentucky's equitable tolling statute provides as follows:

When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding *or concealing himself or by any other indirect means obstructs the prosecution of the action*, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced. But this saving shall not prevent the limitation from operating in favor of any other person not so acting, whether he is a necessary party to the action or not.

Ky. Rev. Stat. § 413.190(2) (emphasis added). Ordinarily, this statute only tolls the statute of limitations when a defendant commits an affirmative act that conceals his wrongdoing. *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 915 (Ky. 1992). However, "where the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2)[.]" *Id.*

Two parallel rules govern the application of Kentucky's equitable tolling statute in cases where the defendant conceals his wrongdoing. Typically, the limitations period begins to run when: (i) the defendant's wrongful concealment is revealed to the plaintiff; or (ii) the plaintiff "should have discovered his cause of action by reasonable diligence." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575 (Ky. 2009). "When a confidential relationship exists between the parties, however, the statute does not begin to run until actual discovery of the fraud [or] mistake." *Hernandez v. Daniel*, 471 S.W.2d 25, 26 (Ky. 1971). "The rationale of the actual notice requirement is that persons in a confidential relationship do not have the reason or occasion to check up on each other that would exist if they were dealing at arm's length." *McMurray v. McMurray*, 410 S.W.2d 139, 141–42 (Ky. 1966).

The seminal case applying Kentucky's equitable tolling statute in the context of a confidential relationship is *Security Trust Co. v. Wilson*, 210 S.W.2d 336 (Ky. 1948). In *Security Trust*, the plaintiff's uncle and guardian wrongfully appropriated property the plaintiff inherited from her deceased father. *Id.* The plaintiff brought suit decades after the wrongful transfer, and the defendant argued that the claims were time barred. *Id.* at 337. The Kentucky Court of Appeals, at that time Kentucky's highest court, disagreed, holding that a fiduciary relationship existed between the plaintiff and her uncle, and the uncle's failure to disclose the wrongful transfer tolled the statute of limitations. *Id.* at 339.

In explaining the rationale for its holding, the Kentucky Court of Appeals focused on the close family relationship between the plaintiff and her uncle.  The court cited the prevailing rule from other jurisdictions that:

> *Where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may be excused.*  In such a case so long as the relationship continues uprepudiated [sic], there is nothing to put the injured party on inquiry, and he cannot be said to have failed to use diligence in detecting the fraud.  Thus it has been held that a complainant is not chargeable with want of diligence in not *discoverning* [sic] the fraud of his guardian in concealing the receipt and existence of property where such guardian was his step-father, in whose family, and as whose child he was brought up, and in whom he had implicit confidence, *there being no reason to suspect that a fraud was being practiced.*

*Id.* at 338 (first and third emphases added; citation and internal quotation marks omitted).  Applying these principles, the court reasoned "that considering the fact that [the defendant] was the uncle of the plaintiff . . . such a fiduciary relationship existed between the [uncle] and this plaintiff that it would have been embarrassing for her to have questioned her uncle's integrity, or have demanded that he show her the bonds which he said were in his possession[.]" *Id.* at 339.  The court thus held that the uncle's failure to disclose his misappropriation of her assets "tolled the running of the statute of limitations" notwithstanding the plaintiff's failure to discover the wrongdoing. *Id.* at 340.

Defendants argue that *Security Trust* only applies to cases where the plaintiff has no reason whatsoever to suspect that the defendant has engaged in any wrongdoing.  Instead, Defendants argue that the Court should follow the rule ostensibly set forth in *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952), where the Kentucky Court of Appeals stated that the statute of limitations "begins to run . . . when the fraud or concealment . . . should have been discovered by the exercise of reasonable diligence by the injured [party]."

Defendants' interpretation misreads *Adams*.  In that case, a doctor negligently left a piece of rubber tubing inside of a patient during surgery. *Id.*  When the patient discovered the tubing, the doctor told him not to worry because the tubing would eventually degrade within the body. *Id.*  The tubing did not erode over the course of twenty years, causing the patient to lose one of

his lungs. *Id.* When the plaintiff later brought suit, the defendant argued that his cause of action was barred by the statute of limitations.

The Kentucky Court of Appeals disagreed, holding that the limitations period was tolled after the doctor concealed the degree of the plaintiff's injury by advising him that the rubber tube was not harmful. *Id.* The court once again placed special emphasis on the "intimate" relationship between the plaintiff and the defendant:

> The relationship of a patient to his physician is by its very nature one of the most intimate. Its foundation is the theory that the physician is learned, skilled and experienced in the afflictions of the body about which the patient ordinarily knows little or nothing but which are of the most vital importance to him. Therefore, the patient must necessarily place great reliance, faith and confidence in the professional word, advice and acts of his doctor. It is the physician's duty to act with the utmost good faith and to speak fairly and truthfully at the peril of being held liable for damages for fraud and deceit. 41 Am.Jur., Physicians and Surgeons, Secs. 70, 73, 74; 70 C.J.S., Physicians and Surgeons, § 36; Cf. Walden v. Jones, 289 Ky. 395, 158 S.W.2d 609, 141 A.L.R. 105. *Since the relationship of physician and patient begets confidence and reliance, a liberal attitude should be taken in behalf of the patient. No degree of deceit or fraud by the doctor to avoid legal liability for malpractice by enabling himself to set up the shield of the statute of limitations should be permitted.* Schmucking v. Mayo, 183 Minn. 37, 235 N.W. 633; Groendal v. Westrate, 171 Mich. 92, 137 N.W. 87, Ann.Cas. 1914B, 906; Hudson v. Shoulders, 164 Tenn. 70, 45 S.W.2d 1072. We have so held in cases where the relationship was that of mother and son, Loy v. Nelson, 201 Ky. 710, 258 S.W. 303 and guardian and ward. Security Trust Co. v. Wilson, 307 Ky. 152, 210 S.W.2d 336.

*Id.* at 793–94 (emphasis added). Notably, the court did *not* run the statute of limitations from the time the plaintiff reasonably should have discovered his cause of action—the instant the doctor confirmed his malpractice. Instead, the court applied its rule from *Security Trust* that the limitation period should be tolled when a defendant abuses a confidential relationship to prevent the plaintiff from discovering her cause of action. *Id.*

This case closely parallels *Security Trust*. As in *Security Trust*, Plaintiffs and Defendants were in a close family relationship that would have made it difficult for Plaintiffs to question their brothers' integrity or demand a detailed accounting of the brothers' business activities. The parties' family dynamics were such that Plaintiffs trusted their brothers implicitly, and generally deferred to their business judgment. Moreover, Defendants reacted aggressively and

disparagingly whenever Plaintiffs tried to inquire into Defendants' management of the family business and their parents' assets. Under these circumstances, Kentucky law excuses Plaintiffs' failure to discover Defendants' wrongful conduct.[3] *Security Trust*, 210 S.W.2d at 338 ("Where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may be excused." (citation omitted)).

Martom separately argues that equitable tolling cannot apply to Plaintiffs' claims against it, because it was never in a fiduciary relationship with Plaintiffs. We reject this argument. The district court found that Martom was created by Griffy and Dennis to wrongfully circumvent Kentucky's law against self-dealing. Kentucky law places persons and entities that aid or abet a tort in the same position as the primary tortfeasor. *See Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 486 (Ky. 1991); *cf. Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (explaining that Kentucky follows § 876 of the Second Restatement of Torts, which imposes aiding and abetting liability on parties that knowingly assist in a tortfeasor's breach of fiduciary duties). Because Martom participated in Griffy and Dennis' wrongdoing, equitable principles prevent it from invoking the statute of limitations. *Emberton*, 299 S.W.3d at 573 (noting that Kentucky's equitable tolling statute does not permit an "inequitable resort to a plea of limitations" (quoting *Adams*, 249 S.W.2d at 793)).

## C.    Effect of Betsy's 1990 Lawsuit

Defendants next argue that the *Holt* Plaintiffs' claims are barred by: (i) the release provision in the 1993 settlement agreement they signed terminating Betsy's derivative claims against Dennis and Griffy; and (ii) the doctrine of collateral estoppel.[4] Once again we disagree.

---

[3]Defendants cite *Ham v. Sterling Emergency Servs. of the Midwest, Inc.*, 575 F. App'x 610, 614 (6th Cir. 2014), for the proposition that a party "is not obstructed or misled under [Section 413.190(2)] if the exercise of reasonable diligence would allow him to pursue his claim," even where the obstructive conduct is "remain[ing] silent when the duty to speak or disclose is imposed by law." (citation and internal quotation marks omitted). However, *Ham* is distinguishable because it did not involve a confidential fiduciary relationship between family members. Kentucky law did not require the *Holt* Plaintiffs to disbelieve their brothers' representations and accuse them of fraud in order to preserve their claims.

[4]All parties concede that the 1993 settlement prevents Betsy from bringing any claims related to the 1986 stock transactions.

The district court refused to enforce the release provision in the 1993 settlement agreement because it found that Defendants violated their fiduciary duties to the *Holt* Plaintiffs by misrepresenting the nature of Betsy's 1990 lawsuit, failing to disclose their own wrongdoing, and misleading the *Holt* Plaintiffs into signing an inequitable settlement agreement. The district court also rejected Defendants' collateral estoppel argument because it determined that the *Holt* Plaintiffs were not adequately represented in Betsy's lawsuit. The district court found that Betsy's position was adverse to the *Holt* Plaintiffs—at one point during the settlement negotiations, Betsy rejected a proposal that the *Holt* Plaintiffs receive a portion of Griffin Industries' stock because doing so would have diluted her own share. Because the *Holt* Plaintiffs thus did not have a full and fair opportunity to litigate their rights in the 1990 lawsuit, the district court found that the suit could not bar their claims in this lawsuit.

On appeal, Defendants attack the district court's determination on two grounds. First, Defendants argue that the district court already determined in the 1990 lawsuit that Betsy was an adequate representative for the *Holt* Plaintiffs, and aver that the district court's prior determination should govern in this case as well. Second, Defendants argue that they ceased having fiduciary duties to the *Holt* Plaintiffs once Betsy brought the derivative suit, because the *Holt* Plaintiffs and Defendants then became adverse parties.

Much like the district court, we do not find Defendants' arguments persuasive. We have reviewed the record from the 1990 lawsuit, and the district court never determined that Betsy was an adequate representative of the *Holt* Plaintiffs' interests. Instead, the district court expressly reserved that issue for trial, and the issue was never litigated further because Betsy's settlement terminated the proceedings. We cannot find support for Defendants' representations to the contrary. Because there is no real question that the *Holt* Plaintiffs were *not* adequately represented in the prior suit—Betsy's litigation conduct shows that she was not trying to maximize recovery for her sisters—Defendants cannot invoke collateral estoppel against them. *See Moore v. Commonwealth*, 954 S.W.2d 317, 319 (Ky. 1997) (collateral estoppel requires that the party have had "a full and fair opportunity to litigate" the prior suit).

Moreover, Defendants cite no authority for their dubious claim that they ceased having any fiduciary duties to the *Holt* Plaintiffs once Betsy filed her 1990 derivative lawsuit. Under

Kentucky law, fiduciary duties continue as long as the parties enjoy a confidential relationship. *See Steelvest*, 807 S.W.2d at 486. The record is clear that Defendants continued to have a confidential relationship with the *Holt* Plaintiffs even after Betsy filed the 1990 lawsuit; indeed, the *Holt* Plaintiffs signed the 1993 settlement agreement precisely because they continued to trust Dennis and Griffy implicitly. Moreover, it would create an entirely untenable rule if we were to accept Defendants' arguments. If the filing of a shareholder derivative suit relieved management of all of its fiduciary duties to the corporation and its shareholders, then management could plunder a corporation's assets with impunity every time a derivative suit is filed against them. This outcome would, of course, undermine the very purpose animating the law of fiduciary duties, which is to assure that fiduciaries do not betray the trust reposed in them.

In arguing to the contrary, the dissent posits that Defendants had no "brotherly 'fiduciary duty' to discourage settlement" with their sisters because "the parties were engaged on opposite sides of a lawsuit in which the sisters claimed serious wrongdoing by the brothers." Post at 57 (Opinion of Merritt, J.). This formulation misstates key facts regarding the 1993 lawsuit. The "sisters," plural, did not sue Defendants in 1993—Betsy did, and her settlement with Defendants unquestionably prevents her from recovering any additional sums related to Defendants' illicit stock transactions. *See supra*, note 4. Linda, Cyndi, and Judy, by contrast, were only nominal parties to the lawsuit because Betsy brought a derivative claim on behalf of all Griffin Industries shareholders. The district court found that these sisters did not discover the nature of Betsy's lawsuit until 2010 because Defendants hid and lied about Betsy's claims, and that Defendants browbeat them into signing a settlement agreement that they had not read and did not understand.

Thus, contrary to the dissent's insinuations, our holding is not that adverse parties always continue to owe fiduciary duties to one another during litigation, or that Defendants were not permitted to settle with the *Holt* Plaintiffs. Rather, it is that fiduciaries are not relieved of their duty of loyalty towards their beneficiaries just because those beneficiaries are unknowingly swept up in a third party's shareholder derivative lawsuit against the fiduciaries. If Defendants wished to settle with the *Holt* Plaintiffs, they were required to follow settled agency principles and make sure that the *Holt* Plaintiffs understood the rights that they were signing away. *See* Restatement (Second) of Contracts § 173 (1981) ("If a fiduciary makes a contract with his

beneficiary relating to matters within the scope of the fiduciary relation, the contract is voidable by the beneficiary, unless (a) it is on fair terms, and (b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know."). Any other rule would permit widespread misbehavior by fiduciaries subject to active derivative lawsuits, even though most of the shareholder-beneficiaries had no role in initiating the suit—a truly damaging and illogical result.

Our conclusion that Dennis and Griffy continued to owe fiduciary duties to the *Holt* Plaintiffs after Betsy's 1990 lawsuit was filed makes clear that the brothers' failure to disclose the nature of the lawsuit and the 1993 settlement to the *Holt* Plaintiffs rendered the settlement's release provision invalid. Numerous cases establish that contractual releases between a fiduciary and a beneficiary are unenforceable if the fiduciary fails to make sufficient disclosures to allow the beneficiary to fairly determine whether to release her claims. *See, e.g.*, *Masterson v. Pergament*, 203 F.2d 315, 322 (6th Cir. 1953) ("A release obtained by a fiduciary through concealment or misrepresentation is of no effect."); *Mazak Corp. v. King*, 496 F. App'x 507, 511 (6th Cir. 2012) (Like "the vast majority of state and federal courts," Kentucky law requires that a "release must be set aside if the fiduciary failed to make a full disclosure of all relevant facts to the beneficiary."); *Hale v. Moore*, 289 S.W.3d 567, 582–83 (Ky. Ct. App. 2008) (holding that release signed by beneficiaries was invalid where the beneficiaries "were not fully apprised of the consequences of signing the [release] by" their fiduciaries).

Accordingly, we hold that the 1993 settlement agreement and the doctrine of collateral estoppel do not bar Plaintiffs' claims.

**D.      Arguments That Defendants Did Not Breach Their Fiduciary Duties**

**1.      Liability for Sales of John's Griffin Industries Stock**

**i.      Choice of Law**

Defendants argue that they could not have breached any fiduciary duties with respect to the 1986 sale of their father's Griffin Industries stock from his revocable trust, because they did not owe any fiduciary duties to Plaintiffs at all. John's revocable trust contains a choice of law

clause specifying that the trust is governed by Ohio law.  Under Ohio law, trustees of revocable trusts owe fiduciary duties only to the trust's settlor, and not to any of its beneficiaries, unless the settlor becomes incapacitated or dies.  See Ohio Rev. Code § 5806.03(A); *Puhl v. U.S. Bank, N.A.*, 34 N.E.3d 530, 536 (Ohio Ct. App. 2015) ("[T]he duties of the trustee are owed exclusively to the settlor during the settlor's lifetime.").  John did not die until 1995, and the district court made no express finding that he became incapacitated; accordingly, Defendants arguably had no fiduciary duties to Plaintiffs under Ohio law when the 1986 stock sales occurred.  Therefore, Defendants argue that the district court's judgment must be vacated insofar as it penalized them for improper sales they made as John's trustees.

We reject Defendants' argument because we conclude that Kentucky courts would apply Kentucky law to this dispute notwithstanding the trust's Ohio choice of law clause.  Federal courts exercising supplemental jurisdiction must apply the forum state's choice of law rules to select the applicable state substantive law.  *See Felder v. Casey*, 487 U.S. 131, 151 (1988); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014).  Under Kentucky law, the "meaning and effect of the terms of a trust . . . are determined by . . . (1) [t]he law of the jurisdiction designated in the terms [of the trust instrument] unless the designation of that jurisdiction's law is contrary to a strong public policy of the jurisdiction having the most significant relationship to the matter at issue[.]"  Ky. Rev. Stat. § 386B.1-050(1) (emphasis added).

We have uncovered no Kentucky cases applying or rejecting a choice of law clause in a trust, and the parties have not cited any such cases.  We are thus left without any binding authority to guide us in determining whether applying Ohio law to this dispute would be "contrary to a strong public policy of the jurisdiction having the most significant relationship to the matter at issue."  *Id.*  However, Kentucky has numerous cases dealing with the applicability of contractual choice of law clauses.  Because such clauses serve an identical purpose whether they appear in trust instruments or contracts, these cases are highly relevant in fashioning our *Erie* guess as to which state's law Kentucky courts would apply to this case.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

In the contractual context, we have recognized that "Kentucky courts will not automatically honor a choice-of-law provision, to the exclusion of all other considerations." *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000). As we have noted on numerous occasions, Kentucky courts have an extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws. *See, e.g.*, *id.* at 391 ("On at least two occasions, we likewise have noted this provincial tendency in Kentucky choice-of-law rules."); *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 230 (6th Cir. 1997) (noting that "Kentucky does take the position that when a Kentucky court has jurisdiction over the parties, '[the court's] primary responsibility is to follow its own substantive law.'" (alteration in original) (quoting *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972))); *Johnson v. S.O.S. Transp., Inc.*, 926 F.2d 516, 519 n. 6 (6th Cir. 1991) ("Kentucky's conflict of law rules favor the application of its own law whenever it can be justified."); *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983) ("Kentucky courts have apparently applied Kentucky substantive law *whenever possible* . . . . [I]t is apparent that Kentucky applies its own law unless there are overwhelming interests to the contrary." (emphasis in original) (discussing *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717 (Ky. 1982))); *see also Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987) (noting that Kentucky courts "are very egocentric or protective concerning choice of law questions"), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994).

In *Wallace Hardware*, we made an *Erie* guess that Kentucky courts would enforce contractual choice of law provisions unless "the chosen state has no substantial relationship to the parties or the transaction." 223 F.3d at 397 (citation and internal quotation marks omitted). Subsequently, the Kentucky Supreme Court has confirmed that it will apply its own law to a dispute with ties to Kentucky, even in spite of an otherwise-valid choice of law clause. *See Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566–67 (Ky. 2012) (applying Kentucky law in spite of a New York choice of law provision because "Kentucky had the greater interest in, and the most significant relationship to, the transaction and the parties"). Thus, we have had to admit that our *Erie* guess in *Wallace Hardware* was wrong, and that Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky. *See Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563,

570 (6th Cir. 2016) ("Thus, as several federal district court decisions have noted, *Wallace Hardware*'s assumption about the Kentucky Supreme Court's application of [choice of law clauses] has now proven faulty.").

In the instant case, there can be no question that Kentucky has the most significant relationship to John's revocable trust. *See* Restatement (Second) of Conflict of Laws §§ 270, 6 (1971). John, his business, his trustees, most of his assets, and most of his trust's beneficiaries were all centered in Kentucky. The trust's only apparent ties to Ohio are that: (i) it was created in Ohio; and (ii) John's lawyers were in Cincinnati, Ohio. Thus, Kentucky has a far more significant relationship to the trust than does Ohio. The only remaining question is whether Kentucky has a "strong" enough public policy to overcome the default presumption that Ohio law applies per the terms of the trust's choice of law provision. Ky. Rev. Stat. § 386B.1-050(1).

We believe that Kentucky courts would apply Kentucky law in determining the fiduciary duties created by John's trust. Kentucky's public policy of protecting trust beneficiaries against self-dealing trustees is so strong that Kentucky has enacted a separate statutory provision confirming that none of its other statutes governing trusts "in any way relieve a fiduciary who breaches his trust and causes any loss thereby of his liability under his bond, or of any civil or criminal liability provided for by law." Ky. Rev. Stat. § 386.150. Moreover, as stated earlier, Kentucky also has an unusually strong preference for applying its own laws, even in the face of valid choice of law provisions. When these factors are weighed together, we believe that Kentucky courts would not apply Ohio law, particularly since doing so might relieve Defendants of liability for wrongful conduct that occurred in Kentucky, where the effects of this litigation will be mostly felt.[5]

---

[5]Kentucky is alone in our Circuit in its refusal to regularly honor choice of law provisions. *See Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (choice of law provisions generally enforceable under Ohio law); *Town of Smyrna v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 645–46 (6th Cir. 2013) (same for Tennessee); *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (same for Michigan). Nevertheless, we must faithfully apply Kentucky's choice of law policy even though other states may have given more deference to the choice of law provision in John's trust. Because Kentucky has by far the greatest interest in the subject matter of this lawsuit, we believe that Kentucky courts would apply their own law in adjudicating this dispute, and we thus follow suit.

Applying Kentucky law, we must reject Defendants' argument that they did not have any fiduciary duties to their sisters stemming from their positions as trustees of John's trust. Under Kentucky law, "a trustee has a specific duty, inherent to the trust relationship, to provide information relating to the trust and [] this specific duty extends to [the trust's] conditional or contingent beneficiaries," such as Plaintiffs. *JP Morgan Chase Bank, N.A. v. Longmeyer*, 275 S.W.3d 697, 701 (Ky. 2009). Moreover, fiduciary duties also attach where two parties are in "a confidential relationship" such that one party "repos[es] a certain degree of trust and confidence in" the other. *Steelvest*, 807 S.W.2d at 486. Thus, in this case, Defendants were in a fiduciary relationship with Plaintiffs for two reasons: (i) Defendants were trustees of John's trust, and Plaintiffs were among the trust's contingent beneficiaries; and (ii) Defendants assumed responsibility for managing the family's financial affairs, and encouraged Plaintiffs to trust that they would fairly administer their father's assets. We therefore hold that the choice of law provision in John's trust does not shield Defendants from liability.

### ii.     Liability Analysis

Defendants argue that even if Kentucky law applies, they did not breach their fiduciary duties to their sisters because John ratified the 1986 stock sales in the Fourth Amendment and Sixth Codicil to his trust and will, respectively. Those two instruments made clear that John's sons would get all of his interest in Griffin Industries, and that his daughters would receive any cash left in his estate. Defendants argue that John had all of the information necessary to ratify the past transactions because of his "life experience" and general knowledge of how he wanted to divide up his estate.

The district court took a contrary view. As recited earlier, under Kentucky law, trustees have "a specific duty, inherent to the trust relationship, to provide information relating to the trust and [] this specific duty extends to conditional or contingent beneficiaries." *JP Morgan Chase*, 275 S.W.3d at 701. The district court found that Defendants violated this duty by failing to notify their sisters (the trust's contingent beneficiaries) of the stock transactions.

The district court further found that the Fourth Amendment and Sixth Codicil were insufficient to ratify Defendants' breaches of their fiduciary duties. Under Kentucky law,

ratification of an agent or fiduciary's wrongful "conduct requires two elements: 1) an after-the-fact awareness of the conduct; and 2) an intent to ratify it." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 875 (Ky. 2016). Whether the principal's "'conduct is sufficient to indicate consent' to ratification 'is a question of fact[.]'" *Pannell v. Shannon*, 425 S.W.3d 58, 84 (Ky. 2014) (citation omitted). "Conduct that can be otherwise explained may not effect ratification." Restatement (Third) of Agency § 4.01(2) cmt. d (2006). The district court explained its finding that John lacked intent to ratify as follows:

> Based on the totality of the evidence, including [John's] pre-stroke estate documents, and the credibility of the witnesses, the Court concludes that, even in the absence of the 1985 Plan, [John] would not have sold his stock to his sons during his lifetime. Rather, as was its impression at summary judgment, the Court concludes that [John's] purported ratifications of those sales—in the Sixth Codicil to his will, the Fourth Amendment to his Trust, and the affidavit he purportedly executed on January 20, 1992 — were orchestrated by Dennis and Griffy, with the assistance of counsel, "to obtain [John's] *post hoc* imprimatur on the prior sales that defendants orchestrated for purposes of retaining control of the Company." (Doc. 590 at 51). This conclusion is supported by the fact that these actions were taken during the pendency of—and most likely in response to—Betsy's 1990 lawsuit.
>
> []The Court further concludes that, given the testimony about [John's] condition after his stroke, Dr. Parsons' evaluation, and the surrounding circumstances, [John] did not have "full knowledge of the material facts" such that any valid ratification occurred. *See Int'l Shoe Co. v. Johnson*, 252 Ky. 440, 508 (Ky. 1934) (citations omitted).

(R. 856, ¶¶ 249–50.)

In other words, the district court found that prior to his stroke, John had manifested a consistent intention to divide his estate equally amongst his children. After his stroke, John had a functional IQ of roughly 67, and, at the behest of his sons, started signing estate plan changes that conveniently benefitted the sons in litigation against his daughters. The district court found this sequence of events suspicious, and ultimately concluded that Defendants manipulated John into functionally disinheriting his daughters. Defendants have pointed to no facts that convincingly rebut this version of the events, and we thus cannot hold that the district court clearly erred. In fact, the district court's conclusion is supported by Dennis's own statements that John could not understand complex issues after his stroke. Accordingly, we hold that the

district court's conclusion that John lacked sufficient intent to ratify Defendants' breaches was not clearly erroneous.

## 2. Liability for Sales of Rosellen's Griffin Industries Stock

Defendants next argue that they could not have breached any fiduciary duties with respect to the sale of Rosellen's Griffin Industries stock, because they had no fiduciary duties to Plaintiffs with respect to their administration of their mother's estate. When Rosellen died in 1985, her estate plan specified that her stock would pass to John, with the residue of her estate going to her trust. John disclaimed his interest in Rosellen's stock, which meant that under Rosellen's will, her stock was supposed to flow first into her trust, and then to her children equally. Instead of following Rosellen's wishes, Dennis and Griffy, the executors of her estate, sold the stock to themselves at an allegedly reduced price, and distributed the sale proceeds to Rosellen's trust. This was a classic case of improper self-dealing, which unquestionably violated Defendants' fiduciary duties to Rosellen's estate and her trust. *See, e.g.*, *Hutchings v. Louisville Tr. Co.*, 276 S.W.2d 461, 464 (Ky. 1954) ("The law does not permit a person in a fiduciary capacity to handle the beneficiary's property so as to further his own ends.").

Nevertheless, Defendants argue that only the trustee managing Rosellen's trust (Star Bank) had the right to sue to recover property owed to Rosellen's trust, and not any of the trust's beneficiaries. In support of this argument, Defendants cite *Forester v. Wener*, 191 S.W. 884 (Ky. 1917), and *Lovell v. Nelson*, 29 Ky. 247 (1831).

Neither of these cases convincingly supports Defendants' argument. In *Forester*, the Kentucky Court of Appeals briefly stated in *dicta* that the plaintiff beneficiary "would have no standing in this suit to recover any part of [the property allegedly owed to the trust], because her interest . . . is devised to trustees, and they, and not she, would be the ones to sue to recover on it." 191 S.W. at 885. In the very next sentence, however, the court stated that "[h]aving determined that the [defendant] owns the income individually and not as trustee for her children, *it becomes unnecessary to consider the duties of trustees or the rights of cestui que trusts discussed by counsel for plaintiff in his brief.*" *Id.* (emphasis added). There is much danger in

drawing a sweeping rule from *dicta* in a century-old case where the court makes clear that it has not fully considered the opposing party's arguments.

Moreover, *Lovell* is not on point at all. In that case, the trustee conveyed a piece of real property to a third party, and gave the third party the right to sell the land under certain conditions. 29 Ky. at 247. In the contract with the third party, the trustee promised to compensate the trust beneficiary if any of the land was sold. *Id.* The trust beneficiary sued when the third party sold some of the land, claiming that the trustee had breached the contract with the third party. *Id.* The court held that the beneficiary could not sue to enforce the contract because it was not a party to it, and not because of any principles of trust law. *Id.* Even the court's limited contract holding in *Lovell* has likely been superseded by the modern law of third party beneficiaries. *See Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 595–96 (Ky. 2012).

Instead, the correct rule is set out in the Second Restatement of Trusts. That treatise states that a trust beneficiary may maintain a suit in equity against a third party for property improperly diverted from the trust if: (i) "the trustee improperly refuses or neglects to bring an action against the third person;" or (ii) "there is no trustee." Restatement (Second) of Trusts § 282(2)–(3) (1959).

Both of these conditions are met in this case. Unquestionably, Defendants breached their fiduciary duties to Rosellen's trust by violating Rosellen's will and engaging in a self-dealing transaction to acquire her Griffin Industries stock. The trustee should have brought suit to force Defendants to convey the shares to the trust, but neglected to do so. This omission authorized Plaintiffs, as the trust's beneficiaries, to sue in equity for the property owed to the trust. *Id.* § 282(2). Moreover, the record contains an affidavit from Star Bank stating its belief that the trust was dissolved, and its duties were terminated, when all trust property was distributed in 1989. (R. 430-13, PageID #19502.) Therefore, there was no trustee anymore to sue on behalf of the trust, and Plaintiffs were therefore authorized to bring suit themselves. Restatement (Second) of Trusts § 282(3).

We have located no Kentucky case squarely addressing a beneficiary's right to sue when the trustee fails to remedy a breach of fiduciary duties. Nevertheless, we believe that the

Kentucky Supreme Court would adopt § 282 of the Second Restatement, because that court has cited the Second Restatement numerous times in articulating principles of Kentucky trust law. *See, e.g.*, *Cummings v. Pitman*, 239 S.W.3d 77, 81 n.2 (Ky. 2007), *overruled on other grounds by Caesar's Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51 (Ky. 2011); *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 179 (Ky. 2000); *Rakhman v. Zusstone*, 957 S.W.2d 241, 244 (Ky. 1997); *First Ky. Tr. Co. v. Christian*, 849 S.W.2d 534, 538 (Ky. 1993); *Phillips v. Lowe*, 639 S.W.2d 782, 783–84 (Ky. 1982); *Eitel v. John N. Norton Mem. Infirmary*, 441 S.W.2d 438, 442 (Ky. 1969). Accordingly, we hold that Plaintiffs had the right to bring suit on the harm they suffered from Defendants' failure to convey Rosellen's stock to her trust.

As a last-ditch argument, Defendants assert that they could not have breached their fiduciary duties to Rosellen's estate or her trust (and by extension, to Plaintiffs), because Kentucky law explicitly authorizes an executor to sell estate assets unless "distribution in kind has been demanded prior to the sale by the . . . beneficiary entitled to such distribution in kind." Ky. Rev. Stat. § 395.200(3). Defendants further point out that Plaintiffs never demanded distribution in kind at the time of Rosellen's death. This is all true enough—but while Kentucky law might authorize executors to sell the decedent's property in some circumstances, it most certainly does not authorize executors or other fiduciaries to engage in self-dealing. *Hutchings*, 276 S.W.2d at 464. And moreover, as the district court noted, Plaintiffs never had a fair opportunity to demand distribution in kind because Defendants hid their illicit stock transactions and failed to inform Plaintiffs of their machinations.

In *Lucas v. Mannering*, the Kentucky Court of Appeals held that Kentucky law does not invest executors "with the unqualified authority to sell" the estate's property. 745 S.W.2d 654, 656 (Ky. Ct. App. 1987).

> An executrix is a fiduciary. KRS 395.001. More accurately, an executrix is a trustee, and funds of the estate in her hands are trust funds. *Carpenter v. Planck*, 304 Ky. 644, 201 S.W.2d 908 (1947); 31 Am.Jur.2d *Executors and Administrators* Section 2 (1967). The executrix represents the testatrix *and* to a very great extent, the heirs, legatees or distributees, for whose benefit probate proceedings are had. 33 C.J.S. *Executors and Administrators* Section 142 (1942). *See Carpenter*, *supra*.

*Id.* In that case, the court held that the executrix violated her fiduciary duties by selling a piece of real property rather than conveying it in kind to the beneficiaries, even though the beneficiaries had never made a demand for in-kind transfer, because the record reflected "the beneficiaries' desire to take the property in-kind rather than the proceeds from a sale of it." *Id.*

These same principles apply here. Once Plaintiffs found out about the 1986 stock transactions, they immediately wanted the stock itself rather than the sale proceeds Defendants gave the trust after their self-dealing transaction. Under these circumstances, we predict that Kentucky law would not shield Defendants' conduct.

### 3.    Liability for Sales of Craig Protein Stock and Martom Real Estate

Defendants next argue that there was a genuine dispute of material fact as to whether they breached their fiduciary duties with respect to the sales of Craig Protein Stock and Martom Properties real estate. Defendants do not contest that those transactions were self-dealing, but argue that summary judgment was inappropriate because they introduced expert evidence suggesting that the sales were ultimately good for Plaintiffs.

As Plaintiffs rightly note, this argument deserves very little comment. Fiduciaries are prohibited from clandestine self-dealing, period. *Hutchings*, 276 S.W.2d at 464; *see also* Restatement (Second) of Trusts § 170(1) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interests of the beneficiary."). Under this rule, "if the trustee attempts to acquire an interest in the trust property without the consent of the beneficiary, the beneficiary can avoid the transaction *even though the transaction was fair*." Restatement (Second) of Trusts § 170 cmt. w (emphasis added).

Moreover, as Plaintiffs point out, Defendants' transactions were most certainly *not* fair. The evidence in the record shows that the Craig Protein stock was substantially undervalued when Defendants arranged for its sale. Marty and Tommy each separately bought 500 shares of the Craig Protein stock from their brothers at $332,500. They were ultimately allowed to trade those shares for Griffin Industries stock that returned $30,414,000 in distributions, a sizable return on investment. Plaintiffs were never offered this opportunity because Defendants only wanted their brothers to profit from the stock. In short, the evidence shows that Plaintiffs lost

millions of dollars in economic value because of Defendants' inexplicable desire to exclude their sisters from the siblings' inheritance.  We therefore affirm the district court's grant of summary judgment as to Plaintiffs' claims regarding the Craig Protein stock and Martom real estate sales.

### 4.     Martom's Liability

Separate from the other Defendants, Martom offers two arguments for why it cannot be liable for Dennis and Griffy's breaches of fiduciary duties with respect to the 1995 real estate transactions.  Specifically, Martom argues that: (i) it owed no fiduciary duties to Plaintiffs, and did not participate in Dennis and Griffy's wrongdoing; and (ii) even if it did, it acquired the properties through adverse possession.

We reject these arguments as well.  First, under Kentucky Law, where "one purchases land from an executor as such, he is bound to know whether or not the latter is authorized by the will to make the sale, and if the executor has no such power the purchaser is not an innocent or bona fide purchaser."  *Buckner v. Buckner*, 215 S.W. 420, 425 (Ky. 1919) (citation omitted); *Baker v. Pierce*, 812 F.2d 1406, 1987 WL 36585, at *4 (6th Cir. 1987) (unpublished table disposition) (same).

> This is consistent with the common law of trusts.  As the Supreme Court has explained:

> Whenever the legal title to property is obtained through means or under circumstances 'which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never, perhaps, have had any legal estate therein; and a court of equity has jurisdiction to reach the property, either in the hands of the original wrong-doer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust.'

*Moore v. Crawford*, 130 U.S. 122, 128 (1889) (quoting 2 J. Pomeroy, Equity Jurisprudence § 1053, at 628–629 (1886)).

"Importantly, that a transferee was not 'the original wrongdoer' does not insulate him from liability[.]"  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).  Instead, "it has long been settled that when a trustee in breach of his fiduciary duty to

the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty.   The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Id.* at 250.

In the instant case, the district court found that: (i) Dennis and Griffy created Martom so that they could acquire the real estate in John's estate while skirting the law against self-dealing transactions by executors; (ii) the Griffin Industries board agreed to the creation of Martom; (iii) Martom was run entirely by Griffin Industries personnel; (iv) Marty and Tommy knew that Martom was being formed as a vehicle to purchase their father's real estate for Griffin Industries' use; and (v) through "their positions and ownership of Griffin Industries, Dennis and Griffy controlled Martom from its formation to 2010." (R. 856, ¶ 139.)   The district court therefore found that Martom—which was essentially controlled by Dennis and Griffy—was not a *bona fide* purchaser for value, because it knew (as Dennis and Griffy did) that the real estate it bought from John's estate was being improperly conveyed.  *Osborn*, 50 F. Supp. 3d at 802. Defendants have offered no convincing reason why these detailed factual findings should be ignored, and we can think of none.   Accordingly, we reject Martom's argument that it cannot be subjected to transferee liability for Dennis and Griffy's improper real estate transactions.  *Harris Tr.*, 530 U.S. at 250; *Buckner*, 215 S.W. at 425.

Second, Martom cannot establish that it acquired adverse possession of disputed properties under Kentucky law.   One of the requirements for adverse possession is that the possessor makes "open and notorious" use of the property.  *Appalachian Regional Healthcare, Inc. v. Royal Crown Bottling Co., Inc.*, 824 S.W.2d 878, 880 (Ky. 1992).   "To be 'open and notorious' the possession must be conspicuous and not secret, so that the legal title holder has notice of the adverse use."  *Id.*   The district court found that Plaintiffs did not have notice of Martom's possession of the properties until 2010, and that Dennis and Griffy covered up their unlawful real estate transaction.   Accordingly, we hold that Martom's use of the properties was not "open and notorious," even assuming that adverse possession can be a defense to an equitable disgorgement action.

**E.     Laches**

Our dissenting colleague argues that the district court should have invoked the doctrine of laches to truncate Defendants' liability for their illegal mid-1980s stock transactions as of September 10, 1993—the date on which the *Holt* Plaintiffs arguably could have discovered Defendants' conduct through the exercise of reasonable diligence.  *See* Post at 58–60 (citing *Taylor v. Commonwealth*, 302 S.W.2d 583, 584 (Ky. Ct. App. 1957)).  Thus, the dissent proposes remanding to the district court to reconfigure the *Holt* Plaintiffs' award, excluding any profits or interest that accrued after September 10, 1993.

We note that although Defendants put forward and litigated a laches defense before the district court, they have not raised or briefed that issue on appeal.  Ordinarily, we limit our consideration to the issues that the parties properly preserve and put before us.  *See, e.g.*, *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 610 (6th Cir. 2007) ("Courts generally do not decide issues not raised by the parties." (citation omitted)).  However, because the dissent has raised the laches issue, we will exercise our discretion to address the matter, even though the issue has been waived.

Briefly stated, the doctrine of laches "serves to bar claims in circumstances where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action."  *Plaza Condominium Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996).  As the dissent correctly notes, laches may sometimes act to limit a plaintiff's recovery "where it appears that he could have informed himself of the facts [giving rise to the defendant's liability] by the exercise of reasonable diligence," and thereby prevented the accumulation over time of excessive monetary damages.  *Taylor*, 302 S.W.2d at 584.[6]

However, because laches is an equitable defense, it is subject to the limitations imposed by the doctrine of unclean hands.  *See, e.g.*, *Precision Instrument Mfg. Co. v. Automotive*

---

[6]As it is unnecessary to the resolution of this case, we need not decide whether the equitable rule announced in *Security Trust* would excuse a plaintiff's laches when she is misled by a defendant with whom she shares a confidential relationship, as it would excuse her failure to comply with the statute of limitations. *See supra*, § II.B.

*Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands."); *United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir. 1979) ("[L]aches is an equitable defense and . . . it can certainly be raised only by one who comes into equity with clean hands."); *see also Parker v. Parker*, No. 2012–CA–000079–MR, 2013 WL 2359661, at *2 (Ky. Ct. App. May 31, 2013) (invoking the unclean hands doctrine to disallow a laches defense).[7] "Under the 'unclean hands doctrine,' a party is precluded from judicial relief if that party 'engaged in fraudulent, illegal, or unconscionable conduct' in connection 'with the matter in litigation.'" *Mullins v. Picklesimer*, 317 S.W.3d 569, 577 (Ky. 2010) (quoting *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. Ct. App. 2007)). "In a long and unbroken line of cases [the Kentucky Supreme Court] has refused relief to one, who has created by his fraudulent acts the situation from which he asks to be extricated." *Id.* (quoting *Asher v. Asher*, 129 S.W.2d 552, 553 (Ky. 1939)). Because a "trial courts [sic] decision to invoke the equitable defense of the unclean hands doctrine rests within its sound discretion," *id.*, we review a district court's decision to disallow an equitable claim or defense because of unclean hands for abuse of discretion. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995).

In the proceedings below, the district court invoked the unclean hands doctrine and disallowed Defendants' laches defense because it found that Defendants repeatedly and flagrantly violated their fiduciary duties with respect to the administration of their parents' estate plans, and continued these violations even after they were sued by Betsy for their wrongful conduct. The district court thus concluded that Defendants' "decades-long refusal to fulfill their fiduciary duty to deal fairly and openly with their sisters, and to see that the sisters received the property left to them by their parents" should prevent "them from asserting any defense that sounds in equity." (R. 856, ¶ 219.) As we have already affirmed the district court's findings and legal conclusions with respect to Defendants' liability, we cannot say that the district court abused its discretion in determining that Defendants had unclean hands. This conclusion must necessarily end the matter, because a defendant's intentional wrongful conduct "is a dispositive,

---

[7]Although the unclean hands doctrine "is typically employed by a defendant against a plaintiff who seeks equitable relief, . . . it applies equally to a defendant who seeks equitable relief from the chancellor." *Weintraub*, 613 F.2d at 619 n.22. "While it is not normally employed against a defendant merely brought to court by the suit of another, insofar as [a defendant] seeks to invoke the powers of the [court] to bar [a plaintiff's] claim due to laches," the unclean hands doctrine can foreclose the defendant's laches argument. *Id.*

threshold inquiry that bars further consideration of the laches defense . . . ." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). We therefore decline our dissenting colleague's invitation to invoke laches to limit the *Holt* Plaintiffs' recovery.

## III.     Challenges to the District Court's Remedy

### A.     *Daubert* Challenge

#### 1.     Standard of Review

We review the district court's decision to admit expert testimony for abuse of discretion. *See, e.g., Tamraz v. Lincoln Elec. Co.*, 60 F.3d 665, 668 (6th Cir. 2010). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017) (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009)). "For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *Id.* at 441.

"This Court reviews a district court's decision on disgorgement for abuse of discretion." *S.E.C. v. Johnston*, 143 F.3d 260, 262 (6th Cir. 1998), *overruled on other grounds by Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004); *United States v. Universal Mgmt. Servs., Inc., Corp.*, 191 F.3d 750, 762–63 (6th Cir. 1999) ("We review an award of restitution for an abuse of discretion."); *United States v. Ford*, 64 F. App'x 976, 983 (6th Cir. 2003); *see also Rochow v. Life Ins. Co. of N. Am.*, 737 F.3d 415, 427 (6th Cir. 2013) (explaining this Circuit's case law regarding review of equitable disgorgement awards), *vac. for reh'g & overruled on other grounds* 780 F.3d 364 (6th Cir. 2015) (en banc). "An appellate court reviewing damages may adjust and/or correct the [trier of fact's] award based on clear error in calculation and based on the actual claims submitted to the [trier of fact] in closing argument." *Arthur S. Landenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1444 (6th Cir. 1990).

#### 2.     Analysis

An equitable disgorgement award seeks to deprive the wrongdoer of his ill-gotten profits. *Universal Mgmt. Servs.*, 191 F.3d at 763. The district court calculated Defendants' ill-gotten

profits by accepting the testimony of Plaintiffs' sole damages expert, accountant John E. Chilton. Defendants argue that the district court should not have qualified Chilton as an expert because his methodology was fundamentally unreliable. In particular, Defendants argue that Chilton improperly: (i) failed to reduce Plaintiffs' award by the amount of taxes they would have paid if Defendants had not wrongfully deprived them of their Griffin Industries stock; (ii) manipulated key assumptions in his analysis to maximize Plaintiffs' award; and (iii) included sums in the award that were not kept by Defendants, but were actually paid to innocent third parties.

After thoroughly reviewing the record and the relevant law, we conclude that none of Defendants' arguments establish that the district court abused its discretion in either admitting or relying upon Chilton's testimony.

First, Defendants and the dissent argue that Chilton should have taken into account the unique tax structure of a Subchapter S-corporation in calculating Defendants' profits. *See* Post at 61–62. Griffin Industries was an S-corporation. An S-corporation's income taxes are paid directly by its individual shareholders. *See Maloof v. C.I.R.*, 456 F.3d 645, 647 (6th Cir. 2006). Thus, an S-corporation typically distributes enough cash to its shareholders each year to pay the taxes they owe on the S-Corporation's earnings. *Id.* In calculating Defendants' ill-gotten profits, Chilton took into account all of the money Defendants received in disbursements from Griffin Industries, and assessed the portion of the disbursements Plaintiffs would have received if Defendants had not wrongfully deprived them of their shares. Defendants argue that this was error because Defendants were required to pay most (if not all) of their disbursements to the IRS in taxes. Defendants argue instead that Chilton should have reduced the monetary award by the taxes Plaintiffs would have owed if they had owned the Griffin Industries shares all along.

We are not persuaded. The "general rule" is that the plaintiff's recovery "should not be reduced by the amount of money" saved in tax consequences avoided or incurred as a result of the defendant's wrongful conduct. *See Burdett v. Miller*, 957 F.2d 1375, 1383 (7th Cir. 1992) (collecting cases); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (rejecting defendant's argument that the plaintiff's recovery "should be reduced by the amount of tax benefits plaintiffs received"). In *Burdett*, similarly to this case, the defendant argued that the plaintiff's "damages for . . . breach of fiduciary duty" should "be reduced by the amount of

money that [the plaintiff] was able to save by deducting the loss of her investment from her income on her tax returns." 957 F.2d at 1382–83. The Seventh Circuit rejected this argument. Judge Posner explained the rationale behind the rule as follows:

> Suppose, to take a simpler case, that [the defendant] had tortiously destroyed [the plaintiff's] Ming vase worth $10,000 and [the plaintiff] had deducted this amount as a casualty loss on her federal income tax return, garnering a tax saving of $3,000. [The defendant] could not in the ensuing tort suit deduct the $3,000 from the damages due [the plaintiff]. *The tort caused a harm of $10,000, and the fact that the plaintiff was able to lay off a part of the harm on someone else—the taxpayer—is not a good reason to cut down the tortfeasor's damages.* It is true that the result is a windfall to the plaintiff, *but this is better than an equivalent windfall to the tortfeasor . . . .* [T]he only important point here is that the tax treatment of the damages award *is irrelevant to the defendant's liability*; it is a matter between the plaintiff and the government.

*Id.* at 1383 (emphasis added).

In *Fleischhauer*, this Court adopted a similar rationale to prevent the defendant from reducing his liability "by the amount of tax benefits [the] plaintiffs received." 879 F.2d at 1300. The court reasoned that equitable remedies seek "deterrence, therefore, denying defendants the benefit of offsetting tax benefits generated by their illegal [activity] is an appropriate result." *Id.* at 1301.

The same reasoning is applicable to this case. Defendants wrongfully deprived their sisters of a sizable inheritance. The purpose behind an equitable disgorgement award is to deprive wrongdoers of the fruits of their tortious conduct, not to compensate the victim. *Cavanagh*, 445 F.3d at 117. That purpose is served by forcing Defendants to disgorge *all* of cash and assets they received through breaching their fiduciary duties. *Id.*; *Fleischhauer*, 879 F.2d at 1301. The fact that Plaintiffs would have had to pay taxes on the property they were entitled to is irrelevant. Any tax consequences for Plaintiffs' award "is a matter between [Plaintiffs] and the government." *Burdett*, 957 F.2d at 1383.

The dissent separately argues that Chilton's failure to factor in the taxes Plaintiffs would have owed on their Griffin Industries disbursements in calculating Plaintiffs' award violated Kentucky's rule that "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Post at 61 (quoting *Pauline's Chicken*

*Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985)). However, as the dissent acknowledges, this rule applies to awards of *compensatory damages* because those "damages are designed '[t]o restore the party injured, as near as may be, to his former position.'" *Id.* (quoting *Hughett v. Caldwell Cty.*, 230 S.W.2d 92, 96 (Ky. 1950), *abrogated on other grounds by Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290 (Ky. 2015)).[8] No such legal damages were awarded here; as we have explained, the district court ordered Defendants to disgorge their ill-gotten profits in order to prevent them from benefitting from their fiduciary duty violations. Because the district court's equitable award was not tied to the *Holt* Plaintiffs' losses, but rather Defendants' gains, the reasonable certainty principle was not violated. Accordingly, we hold that it was not erroneous for Chilton (and the district court) to calculate the award without reference to tax consequences.

Second, Defendants argue that Chilton made certain improper and inconsistent assumptions that greatly increased his award calculations. Specifically, in calculating Defendants' illicit profits from the stock transactions that concentrated Griffin Industries stock in Defendants' hands, Chilton applied John's estate plan as it existed in 1986, which called for the stock to be divided equally among his eleven children. Subsequently, in calculating the profits from the later sales of Craig Protein stock and Martom real estate, Chilton reasoned that Plaintiffs were each entitled to one-fifth of those proceeds, because John's Sixth Codicil and Fourth Amendment called for such profits to be split equally among his five daughters. Defendants argue that Chilton (and the district court) cannot have it both ways; either: (i) the Sixth Codicil and Fourth Amendments are valid, in which case Plaintiffs cannot recover *anything at all* from the 1986 Griffin Industries stock transactions, but are entitled to one-fifth of the proceeds from the Craig Protein stock and Martom real estate sales; or (ii) the Sixth Codicil and Fourth Amendments are invalid, in which case John's pre-1985 estate plan should be given effect, and each Plaintiff should only be able to recover one-eleventh shares of the property Defendants deprived them of.

---

[8]For example, *Pauline's Chicken* concerned whether the plaintiff could recover lost profits in a breach of contract action, 701 S.W.2d at 401, and *Hughett* addressed the proper way to compensate a trespass victim for the value of lost minerals extracted from his property, 230 S.W.2d at 94. Neither of those cases addressed awards that sounded in equity, as is the case here.

We are not persuaded by Defendants' argument, because it is based on a faulty premise. Specifically, Defendants assume (consistent with their litigation position elsewhere) that the district court invalidated the Fourth Amendment and Sixth Codicil because Defendants manipulated their debilitated father into signing those estate changes. In fact, the court invalidated neither change, because it lacked subject matter jurisdiction to disturb John's estate plan. *Wisecarver*, 489 F.3d at 751. Rather, the district court (and subsequently Chilton) *gave effect* to John's various estate plans by applying the plan terms in effect at the time Defendants consummated each of their wrongful transactions. In this way, the district court and Chilton took each transaction as a snapshot in time, and computed the assets that would have passed to Plaintiffs under the then-existing estate plan if Defendants had fulfilled their fiduciary duties. This procedure was not only proper, it was required, as the district court had no power to alter or disregard John's estate plan.

Finally, Defendants argue that Chilton should not have included in his disgorgement calculation sums that Defendants wrongfully diverted from Plaintiffs, but that were ultimately passed on to innocent third parties, such as Plaintiffs' children. Defendants reason that since disgorgement is meant to recoup Defendants' illicit profits, they should not be required to pay sums that they did not personally benefit from.

Like Defendants' tax argument, which proceeds from a similar premise, this argument is not supported by the law of equitable remedies. As the Second Circuit has recently explained:

> As disgorgement is designed to equitably deprive those who have obtained ill-gotten gains of enrichment, it may be imposed upon innocent third parties who have received such ill-gotten funds and have no legitimate claim to them. [*S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)], citing *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir. 1998). That is consistent with disgorgement's remedial purpose—disgorgement is imposed not to punish, but to ensure illegal actions do not yield unwarranted enrichment even to innocent parties.

> However, unjust enrichment may also be prevented by requiring the violator to disgorge the unjust enrichment he has procured for the third party. As our case law has indicated (and as our opinion here confirms), when third parties have benefitted from illegal activity, it is possible to seek disgorgement from the violator, even if that violator never controlled the funds. The logic of this . . . is that to fail to impose disgorgement on such violators would allow them to unjustly enrich their affiliates. Thus, ordering a violator to disgorge gain the

violator never possessed does not operate to magnify penalties or offer an alternative to fines, but serves disgorgement's core remedial function of preventing unjust enrichment. District courts possess the equitable discretion to determine whether disgorgement liability should fall upon third parties or violators, a responsibility concordant with the district courts' broad discretion to assay disgorgement more generally.

*S.E.C. v. Contorinis*, 743 F.3d 296, 306–07 (2d Cir. 2014) (emphasis added).

In sum, it does not matter that Defendants gave Plaintiffs' property to innocent third parties; the property was not Defendants' to dispose of. When tortfeasors unjustly enrich themselves, courts may force them to disgorge all of their ill-gotten gains. *Cavanagh*, 445 F.3d at 117. It makes no difference that Defendants have transferred the assets to innocent third parties, just as it would make no difference if Defendants gave the assets to charity. The district court (and by extension, Chilton) was well within its considerable discretion to order disgorgement of these sums.

## B.     Burden of Proof

Defendants argue that the district court improperly shifted the burden of proof away from Plaintiffs in calculating the appropriate disgorgement sum. Defendants argue that Chilton's flawed testimony was insufficient to carry Plaintiffs' burden to establish entitlement to a remedy, and that the district court should not have faulted them for failing to put on their own damages expert.

This argument is premised on Defendants' prior arguments that Chilton's testimony was an insufficient basis to support the district court's equitable award. Because we reject Defendants' other attacks on Chilton, we reject this argument as well.

## C.     Prejudgment Interest

### 1.     Standard of Review

The district court's decision to award prejudgment interest was governed by Kentucky law, and we review that decision for abuse of discretion. *Poundstone v. Patriot Coal Co., Ltd.*, 485 F.3d 891, 901 (6th Cir. 2007).

### 2.    Analysis

Defendants next argue that the district court erred in calculating and imposing prejudgment interest.  We disagree.

"Under Kentucky law, if the claim is liquidated, interest follows as a matter of right, but if it is unliquidated, the allowance of interest is in the discretion of the trial court." *Hale v. Life Ins. Co.*, 795 F.2d 22, 24 (6th Cir. 1986).  The Kentucky Supreme Court has recently explained that:

> A damages claim is liquidated if it is "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." [*3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005)] (citation omitted).  Examples include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price." [*Nucor Corp. v. General Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991)].  In contrast, an unliquidated damages claim is one which has "not been determined or calculated, . . . not yet reduced to a certainty in respect to amount." *Id.* (citations omitted).  An unliquidated claim is unspecified and undetermined prior to a breach.  In determining whether a claim is liquidated or unliquidated, "one must look at the nature of the underlying *claim,* not the final award." *3D Enterprises,* 174 S.W.3d at 450.

*Ford Contracting, Inc. v. Ky. Transp. Cabinet*, 429 S.W.3d 397, 414 (Ky. 2014).  In general, "[d]amages that were established by proof offered during the trial are unliquidated and not subject to prejudgment interest." *Id.* (quoting *Jackson v. Tullar*, 285 S.W.3d 290, 299 (Ky. Ct. App. 2007)).

If the trial court determines that the plaintiff's damages are liquidated, it must award "interest at the legal rate of eight percent (8%) per annum." *Pursley v. Pursley*, 144 S.W.3d 820, 828 (Ky. 2004).  If the damages are unliquidated, "the trial court may award prejudgment interest at any rate up to 8%, or it may choose to award no prejudgment interest at all, but it may not exceed the legal rate of 8%." *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001).  Although "Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds," *Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 917 (6th Cir. 2013), such awards are more frequently appropriate in

cases where there are "allegations of bad faith." *See Journey Acquisition-II, L.P. v. EQT Production Co.*, 830 F.3d 444, 462 (6th Cir. 2016) (discussing authority).

In the instant case, the district court determined that Plaintiffs' disgorgement claims were liquidated, and imposed prejudgment interest at 8% compounded annually. In the alternative, the district court stated that it would have imposed the same interest award even if the claims were unliquidated.

Plaintiffs argue that their claims were liquidated because every time Defendants undertook one of the disputed transactions, they knew the portion of the proceeds that were supposed to pass to Plaintiffs under John's estate plan, and therefore the claims were reasonably certain. However, Plaintiffs' disgorgement claims are far afield from "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price"—the examples the Kentucky Supreme Court has given of liquidated damages. *See Nucor Corp.*, 812 S.W.2d at 141. Indeed, Plaintiffs were only able to establish entitlement to their claims by providing expert testimony at trial, a strong indication that the claims were not for liquidated sums. *Ford Contracting*, 429 S.W.3d at 414. We therefore hold that Plaintiffs' claims were unliquidated.

Accordingly, we must determine whether the district court abused its discretion in electing to award prejudgment interest on Plaintiffs' unliquidated claims. *Poundstone*, 485 F.3d at 901. Kentucky law explicitly authorized the district court to award interest at up to 8%, *Fields*, 58 S.W.3d at 467, and to compound the interest annually. *See Travelers Property Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 275 (6th Cir. 2010) ("Under Kentucky law, courts have discretion to award either simple or compound prejudgment interest, though the default is simple interest. Principles of equity are used in order to determine whether compound interest is appropriate in a particular case, which might include unreasonable delay." (citation omitted)). Nevertheless, Defendants argue that the prejudgment interest award was needlessly punitive because of its size (almost as much as the principal), and because the district court did not appreciate its discretion to depart downward from 8%.

We disagree. The record shows that the district court gave thoughtful consideration to the unique equities of this case in formulating its interest award. We will quote the district

court's analysis in full because the district court provided a succinct, but powerful summary of what transpired here:

> Before this Court is an extraordinary case, spanning decades, in which defendants repeatedly and flagrantly violated the fiduciary duties they owed to their sisters, who reposed great trust in their brothers.
>
> There can be no question that prejudgment interest results in a large — very large — recovery. But, as plaintiffs point out, this is a function of the passage of many years since the breaches in question, during which time defendants misled their sisters about the propriety of their actions. But for an errant mailing in 2010, plaintiffs perhaps would never have discovered the wrongs done to them by their brothers. It would [be] inequitable *not* to compensate plaintiffs for the loss of use of millions of dollars for much of their adult lives.

(R. 1131, PageID #37716 (emphasis added).)**[9]**

Under Kentucky law, "equity and justice serve as the foundation upon which an award of prejudgment interest rests." *Ford Contracting*, 429 S.W.3d at 414. Defendants' conduct in manipulating their stroke-impaired father and depriving their sisters of an enormous inheritance was highly unjust and inequitable—far more so than that of a run-of-the-mill tortfeasor. The district court did not abuse its discretion in imposing the largest interest award permissible under Kentucky law.

The dissent offers two arguments for reaching the opposite conclusion. First, the dissent argues that Plaintiffs' "damages were not 'ascertainable' until 2010, when the sisters filed their claims in the district court," and thus no prejudgment interest was permissible for any period prior to the filing of these lawsuits.**[10]** Post at 63 (citing *Tri-State Developers, Inc. v. Moore*, 343 S.W.2d 812, 817 (Ky. 1961)).

This view of the law is outdated. The rule at common law was "that prejudgment interest [was] not awarded on unliquidated claims[.]" *City of Milwaukee v. Cement Div., Nat'l Gypsum*

---

**[9]**One additional point bears mentioning. The district court was correct that the size of the prejudgment interest award, which the dissent regards as noteworthy, is mostly a function of the number of years that passed between Defendants' conduct and the district court's judgment. At 8% compounded annually, the interest will always accrue rapidly. We have uncovered no Kentucky authority suggesting that tortfeasors may use wrongfully acquired profits interest-free if they can hide their wrongdoing for many years before suit is brought.

**[10]**Defendants failed to raise this argument in their briefing before us, and it is thus waived. We address the dissent's arguments for the sake of thoroughness, and not to excuse Defendants' waiver.

*Co.*, 515 U.S. 189, 197 (1995). "The rationale underlying the distinction between liquidated or reasonably ascertainable damages and unliquidated damages [was] that the defendant should not have to pay interest when he is unable to halt the accrual of interest by paying the damages—damages which, if unliquidated, cannot be determined prior to judgment." Anthony E. Rothschild, *Prejudgment Interest: Survey and Suggestion*, 77 Nw. U. L. Rev. 192, 197 (1982); *see also* Post at 63 (making the same argument). Over time, this view of prejudgment interest faced "trenchant criticism," *City of Milwaukee*, 515 U.S. at 197, as courts and commentators began to realize that the "distinction . . . between cases of liquidated and unliquidated damages[] is not a sound one." *Funkhouser v. J.B. Preston Co.*, 290 U.S. 163, 168 (1933) (footnote omitted); *see also Dalton v. Mullins*, 293 S.W.2d 470, 477 (Ky. Ct. App. 1956) ("We are not so much disturbed as to whether the claim is liquidated or unliquidated as we are, in accordance with the popular trend, as to whether justice and equity demand an allowance of interest to the injured party."). As the Supreme Court long ago explained, whether the harms are liquidated or unliquidated, "the injured party has suffered a loss which may be regarded as not fully compensated if he is confined to the amount found to be recoverable as of the time of [the harm] and nothing is added for the delay in obtaining the award of damages." *Funkhouser*, 290 U.S. at 168. Thus most modern courts will permit prejudgment interest on unliquidated claims—even though, by definition, those claims were not "ascertainable" at the time of the harm—"when the period of time between the harm and the judgment is long or when there are other circumstances that would make it unjust not to give interest." *See* Restatement (Second) of Torts § 913 cmt (1) (1979).

Kentucky follows the modern trend and permits prejudgment interest on unliquidated claims in an "amount" to be determined by "the trial court weighing the equitable considerations." *Univ. of Louisville v. RAM Eng'g & Constr., Inc.*, 199 S.W.3d 746, 748 (Ky. 2005). In tort cases alleging "harms to pecuniary interests," the Kentucky Supreme Court has held that prejudgment interest, if any, runs "from the time of the accrual of the cause of action to the time of judgment, if the payment of interest is required to avoid an injustice." *Nucor Corp.*, 812 S.W.2d at 143 (quoting Restatement (Second) of Torts § 913(1)(b)). Thus, the dissent's argument that the district court lacked any discretion to award prejudgment interest prior to the commencement of this lawsuit simply does not reflect the modern state of Kentucky law.

Rather, the only question before us is whether the district court appropriately weighed the equities of this case in deciding whether to award prejudgment interest. *Id.* As explained earlier, we cannot find fault with the district court's equitable consideration in light of Defendants' brazenly wrongful conduct towards their sisters.

The dissent's second argument is that the district court's prejudgment interest award poses serious due process concerns because its size is disproportionately large compared to the gravity of the harm given Plaintiffs' failure to timely discover their tort claims. Post at 64–65. Defendants have not advanced a due process theory in their briefing before us, and thus any due process arguments are waived. *See, e.g., Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief . . . are waived."). It is particularly prudent to enforce this waiver in light of our general preference for declining to pass on unsettled constitutional issues whenever there are alternative grounds available to dispose of a case. *See, e.g., Bond v. United States*, 134 S. Ct. 2077, 2087 (2014) ("[I]t is "a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (quoting *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam))); *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir. 2001) ("Supreme Court precedent makes it clear that courts should avoid unnecessary adjudication of constitutional issues. Where a statutory or nonconstitutional basis exists for reaching a decision . . . it is not necessary to reach the constitutional issue." (citations omitted)).

In any event, we are skeptical of the dissent's due process argument. The dissent speculates that the district court imposed its prejudgment interest award in part as punishment for Defendants' wrongful conduct, and analogizes this case to decisions where the Supreme Court has invalidated excessive punitive damages awards. *See* Post at 64–65. However, "[p]re-judgment interest statutes have a long history, dating at least from 1859 in this country, and have been held to serve the legitimate purpose of making whole an injured party." *Roy v. Star Chopper Co.*, 584 F.2d 1124, 1136 (1st Cir. 1978) (citations omitted). Despite the concept's longevity, we are aware of no case that has invalidated a prejudgment interest award as excessively large under the Fifth Amendment's Due Process Clause.

To the contrary, several courts have upheld prejudgment interest regimes against due process challenges, *see, e.g.*, *Arbon Steel & Serv. Co., Inc. v. United States*, 315 F.3d 1332, 1334 (Fed. Cir. 2003) (upholding prejudgment interest award under rational basis review); *Reyes-Mata v. IBP, Inc.*, 299 F.3d 504, 508 (5th Cir. 2002) (same); *S.E.C. v. Lauer*, 610 F. App'x 813, 820 (11th Cir. 2015) ("The award of prejudgment interest has nothing to do with . . . due process, and cannot be the basis of a motion under Rule 60(b)(4)."), even though the rate of interest awarded was significantly higher than the interest available in the general economy. *See, e.g., Citibank, N.A. v. Barclays Bank, PLC*, 28 F. Supp. 3d 174, 184 (S.D.N.Y. 2013) (upholding New York's statutory interest rate of 9% and observing that even "though 9% is higher than market rates in the current economy, there is no constitutional mandate that the statutory interest rate follow market rates point for point"); *Oden v. Schwartz*, 71 A.3d 438, 457 (R.I. 2013) (upholding 12% interest award). The rationale for these cases is that prejudgment interest is not punitive,[11] "but a recognition that, had the plaintiff recovered immediately, they would had the entire amount of money to use as they pleased," and that it is rational for legislatures and courts to compensate plaintiffs for having been deprived of the use of their property. *Reyes-Mata*, 299 F.3d at 508. We see no compelling reason why the Due Process Clause should pose any barrier to the interest awarded in this case.

**IV.    The Seventh Amendment**

**A.    Standard of Review**

"Whether a party is 'entitled to a jury trial under the Seventh Amendment is a question of law' which we review de novo." *Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528, 540 (8th Cir. 2004) (quoting *Kampa v. White Consol. Indus.*, 115 F.3d 585, 586 (8th Cir. 1997)); *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 827 (4th Cir. 1994).

---

[11]As the Third Circuit has explained, to "the extent [a] defendant has had the free use of the income-producing ability of [the] plaintiff's money without having to pay for it, he has been unjustly enriched. To divest him of this unjustified benefit is not to penalize him, for it has been determined by the trial that it was never rightfully his." *Feather v. United Mine Workers*, 711 F.2d 530, 540 (3d Cir. 1983).

**B.      Analysis**

Finally, Defendants argue that the district court should have conducted a jury trial rather than a bench trial for two reasons: (i) Plaintiffs sought and obtained money damages, which is a classic species of legal relief; and (ii) Defendants' statute of limitations defense was legal in nature, and the district court was required to hold a jury trial on that defense.  Once again, we are compelled to disagree.

The Constitution's Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  The Seventh Amendment's jury trial guarantee applies to "suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered." *Curtis v. Loether*, 415 U.S. 189, 193 (1974) (quoting *Parsons v. Bedford*, 3 Pet. 433, 446–47 (1830) (emphasis in original)).

> "Federal courts faced with a claim of entitlement to a jury trial thus must first "compare the case at issue to '18th-century actions brought in the courts of England prior to the merger of the courts of law and equity,'" *Golden v. Kelsey– Hayes Co.*, 73 F.3d 648, 659 (6th Cir. 1996) (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990)), and then "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.*

*Wilson v. Big Sandy Health Care, Inc.*, 576 F.3d 329, 332 (6th Cir. 2009).

Applying this test, we hold that a jury trial was not required for Plaintiffs' fiduciary duty claims.  The weight of authority holds that actions seeking disgorgement of ill-gotten gains are equitable in nature. *See, e.g.*, *Chauffeurs*, 494 U.S. at 570 ("[W]e have characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits[.]'" (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987))); *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) ("[T]he current law recognizes that actions for disgorgement of improper profits are equitable in nature."); *Cavanagh*, 445 F.3d at 119–20 (collecting authorities); *Roberts v. Sears, Roebuck & Co.*, 617 F.2d 460, 465 (7th Cir. 1980) (observing in *dicta* that "[r]estitution for the disgorgement of

unjust enrichment is an equitable remedy with no right to a trial by jury"); *S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978) (Friendly, J.) (holding that there is no Seventh Amendment right to a jury trial when a plaintiff seeks disgorgement because in a disgorgement action, "the court is not awarding damages to which [a] plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment"). This is because disgorgement "is not available primarily to compensate victims," but rather "forces a defendant to account for all profits reaped through" his wrongful conduct, "even if it exceeds actual damages to victims." *Cavanagh*, 445 F.3d at 117 (footnote omitted). That a district court may exercise its equitable discretion to use disgorged funds to compensate victims—as the lower court did here—does not render such sums legal damages, because they are not awarded to the victims as a matter of right. *Id.* ("Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation . . . ."); *see also S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1192 (9th Cir. 1998) ("The fact that the district court directed that the disgorged funds be returned to the defrauded investors does not change the nature of the remedy."). Indeed, the Supreme Court has long rejected the argument that "any award of monetary relief must *necessarily* be 'legal' relief." *Chauffeurs*, 494 U.S. at 570 (quoting *Curtis*, 415 U.S. at 196).

In arguing that Plaintiffs' fiduciary duty claims sought legal relief, Defendants cite *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002), where the Supreme Court held that restitution is only an equitable remedy when the plaintiff does not seek "to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." But *Knudson* is inapposite. As used in modern parlance, disgorgement and restitution are distinct remedies that serve different purposes. *See William Beaumont Hosp. v. Fed. Ins. Co.*, 552 F. App'x 494, 498 (6th Cir. 2014) (holding that disgorgement and restitution were separate and distinct remedies in construing an insurance contract). As the Fifth Circuit has explained:

> [D]isgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not seek to compensate the victims of the wrongful acts, as restitution does. Thus, a

disgorgement order might be for an amount more or less than that required to make the victims whole.  It is not restitution.

*S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) (citations omitted); *see also Cavanagh*, 445 F.3d at 117 (disgorgement's "emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy"); *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (holding that "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset").  Accordingly, *Knudson* is not on point, and does not cast doubt on the wealth of authority holding that disgorgement is an equitable remedy.

Moreover, *Knudson* itself recognized that the remedy of "accounting of profits" is an "exception" to the general rule that for an action to be equitable, it "must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  534 U.S. at 214 & n.2.  The equitable disgorgement at issue in this case is the modern analog of the "accounting of profits" remedy.

Defendants also quote Plaintiffs' representations during the early stages of this litigation that they were seeking money damages, and argue that these statements show that the district court did not actually award equitable disgorgement.  However, we think that the district court accurately characterized the remedy at issue in this case as one for equitable disgorgement.  (*See* R. 856, ¶ 189 ("[S]ince the only remaining claim [is] the equitable claim for breach of fiduciary duty, seeking the equitable remedy of disgorgement, there [is] no longer a right to trial by jury that [can] be invoked by any party." (citation and internal quotation marks omitted)).)  "Decisions about the characterization of the wrong usually are for the trier of fact, and questions about the nature of the remedy are for the district court in the first instance." *First Nat'l Bank of Waukesha v. Warren*, 796 F.2d 999, 1001 (7th Cir. 1986) (Easterbrook, J.).  The district court was not required to accept Plaintiffs' representations at any point during this litigation about the nature of the remedy they sought, and acted well within its discretion in determining that disgorgement of profits was an appropriate remedy for Defendants' wrongful conduct.

Additionally, our understanding that an action seeking disgorgement of profits is equitable in nature is confirmed by the historical treatment of that remedy prior to the enactment

of the Seventh Amendment.   The term "disgorgement" is relatively new to the law; in 18th century chancery courts, what we now call disgorgement was embodied in the remedies of "accounting, constructive trust, and restitution."  *Cavanagh*, 445 F.3d at 119.  These remedies were almost universally recognized as being within the ambit of courts of equity.  We repeat the Second Circuit's detailed compilation of authorities to underscore this point:

> Commentators have observed that courts of equity now have, and have had for centuries, jurisdiction over claims arising from improper acquisition of assets. Lord Coke wrote that "[t]hree things are to be judged in [the] Court of Conscience: Covin, Accident, and breach of confidence."  4 Edward Coke, *Institutes of the Laws of England* 84 (London, M. Flesher 1644) (1797 ed. reprinted 1986) ("The third is breach of trust and confidence, whereof you have plentiful authorities in our books.").  Blackstone expressed a similar idea: "[I]t hath been said, that *fraud, accident,* and *trust* are the proper and peculiar objects of a court of equity."  3 William Blackstone, *Commentaries on the Laws of England* 431 (photo. reprint 1992) (1768).  Although noting that the maxim quoted oversimplified the overlapping jurisdictions of law and equity, Blackstone wrote that a "technical *trust* indeed, created by the limitation of a second use, was forced into a court of equity . . . [and] ha[s] ever since remained as a kind of *peculium* in those courts."  *Id.* at 431-32; *see also* John Beames, *The Elements of Pleas in Equity* 70 (New York, O. Halsted 1st Am. ed. 1824) (including "[m]atters of trust and confidence" among subjects of equity jurisdiction); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 257 (1993) (considering distinction between law and equity for purposes of interpreting Employee Retirement Income Security Act of 1974 and noting that "*all* relief available for breach of trust could be obtained from a court of equity"); *Lessee of Smith v. McCann*, 65 U.S. (24 How.) 398, 407 (1860) (indicating that in a state maintaining distinct courts of law and equity, "the court of chancery . . . has the exclusive jurisdiction of trusts and trust estates," as it did in England).
>
> Early writings on equity recognized the Chancellor's power to compel disgorgement of wrongly gained assets.  *See* Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* 423-504 (photo. reprint 1972) (1835) (describing remedy of "account," by which chancery ordered an accounting of assets so that wrongly gained profits might be recovered); *id.* at 487-88 (equitable restitution in cases of fraud); *id.* at 490-91 (disgorgement of profits upon waste); 2 John Fonblanque, *A Treatise of Equity* 168 (Philadelphia, A. Small 2d Am. ed. 1820) ("[A] trustee must, especially in equity, make good the trust."); *see also id.* at 171 n. (b) (concluding that "breach of trust" is "a case for the consideration of courts of equity").  Modern works on restitution trace the remedy's history to ancient cases in equity.  *See Restatement of the Law of Restitution, Quasi Contracts and Constructive Trusts,* Pt. I, at 5 (1937) ("Some of the earliest bills in chancery were bills for restitution, such as bills for the

recovery of property obtained by fraud ....”); *see also* 1 Dan B. Dobbs, *Law of Remedies* § 4.3(1), at 587-89 (2d ed. 1993) (discussing equitable remedies of constructive trust and accounting for profits). That the term “disgorgement” has entered common legal parlance only recently cannot obscure that the ancient remedies of accounting, constructive trust, and restitution have compelled wrongdoers to “disgorge”-*i.e.*, account for and surrender-their ill-gotten gains for centuries. *See United States ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *5 (S.D.N.Y. Nov. 4, 2005) (describing disgorgement of profits from fraud as “a ‘classic’ restitutionary remedy inherently distinct from compensable damages” awarded at law); *Dobbs, ante,* at 589 (noting that in cases of constructive trust, in which remedy need not equal actual damages, “the effect can be to give the plaintiff the gain a defendant makes from the sale of the plaintiff’s property and any reinvestment of the funds”).

English equity courts compelled the repayment (in effect, “disgorgement”) of ill-gotten gains in cases decided before our independence. For example, in *Garth v. Cotton*, 27 Eng. Rep. 1182, 1196, 1 Ves. Sen. 524, 546 (Lord Chancellor’s Court 1753), contingent remaindermen sought relief in equity when a life tenant and trustees conspired to defraud the remaindermen by selling timber from the relevant estate and dividing the proceeds among themselves. The plaintiff remainderman, who lacked a remedy at law for now-obscure reasons related to English land law of the time, sought an order compelling the wrongdoers to give him the proceeds of the asserted waste of the land’s assets. *Id.* Lord Chancellor Hardwick obliged, holding that “a reconveyance is just” and ordering that the proceeds of the timber sale, plus interest, go to benefit the estate. *Id.* at 1199; *see also Willoughby v. Willoughby*, 99 Eng. Rep. 1366, 1 Term. Rep. 763 (Lord Chancellor’s Court 1756) (ordering, at the request of a widow cheated of her legacy by her eldest son’s collusion with a trustee and a banker, an accounting of the estate’s assets, the sale of the estate, and payment to the widow and her other children from the proceeds).

American courts also awarded equitable remedies similar to modern disgorgement in cases decided around the time of our nation’s founding. For example, in *Cadwallader v. Mason*, Virginia’s High Court of Chancery considered in 1793 the case of a mortgagor who improperly retained possession of land after the mortgage had been satisfied. George Wythe, *Decisions of Cases in Virginia by the High Court of Chancery* 58 (1795), *reprinted at id.* 188-89 (2d ed. 1852), 2 Va. 185. The rightful owner, who had reclaimed the land through an action at law, sought relief in equity to recover the profits the mortgagor had reaped in the interim. Holding that the mortgagor “may [not] thus justly enrich himself,” the court of equity demanded that the mortgagor “account for such after-taken profits” and give restitution to the landowner. *Id.* The rule against unjust enrichment compelled an award equal to the defendant’s gain, regardless of how much money the plaintiff actually would have earned from the land during the mortgagor’s wrongful possession.

> A Pennsylvania case of the same vintage applied similar reasoning to award devisees the rent collected on their land during the delay between the testator's death and their actual possession. *See Haldane v. Fisher*, 2 U.S. 176 (1792) ("If a man receives my rent, it . . . . may . . . be recovered in equity."); *see id.* at 130 (Yeates, J., concurring) ("misrepresentation or concealment" is clearly "a sufficient foundation for chancery to decree an account to be taken of the rents and profits") (emphasis omitted).

*Id.* at 118–20 (footnotes omitted). To put matters simply, we agree with Lord Coke, Blackstone, Justice Story, the Supreme Court, and the Second and Ninth Circuits, as well as numerous other commentators—an action seeking disgorgement is equitable in nature, even if the district court ultimately directs the funds to the victims of the defendant's conduct.

Finally, we also hold that Defendants were not entitled to a jury trial on their statute of limitations defense. Generally, "when there is a disputed issue of fact as to when a plaintiff 'discovered or should have discovered' his cause of action, that factual issue should be resolved by the jury in cases in which [a party] has asked for a jury." *Elam v. Menzies*, 594 F.3d 463, 467 (6th Cir. 2010). However, in this case, there were no factual issues in the bench trial regarding when Plaintiffs discovered or should have discovered Defendants' wrongdoing. In its summary judgment order, the district court concluded that there was no genuine dispute that Plaintiffs should have discovered their claims in the early 1990s through the exercise of reasonable diligence. *Osborn*, 50 F. Supp. 3d at 807.

Rather, the only remaining statute of limitations issue after the district court's summary judgment order was whether Defendants' violations of their fiduciary duties allowed Plaintiffs to invoke Kentucky's equitable tolling statute. *Id.* at 795–96. Application of equitable tolling principles is, by definition, an equitable issue. *See, e.g.*, *Commonwealth v. Hasken*, 265 S.W.3d 215, 226 (Ky. Ct. App. 2007) ("[T]he issue regarding the equitable tolling of the statute of limitations was one for the circuit court to decide as a matter of law."), *superseded on other grounds by* Ky. Rev. Stat. § 95A.250 (2009).

Moreover, deciding the equitable tolling issue required an assessment of whether and to what extent Defendants breached their fiduciary duties to Plaintiffs. *Osborn*, 50 F. Supp. 3d at 796. ("The record in this case is replete with material factual disputes about whether defendants

made adequate and truthful disclosures to the plaintiffs regarding their parents' estate plans, the settlement of Betsy's 1990 lawsuit, and the disputed transfers of stock and real property."). Put differently, the validity of Defendants' statute of limitations defense turned on the exact same factual issues underlying Plaintiffs' common law fiduciary duty claims for equitable disgorgement. Generally, defendants are not entitled to a jury trial on affirmative defenses when those defenses turn on the same issues as the plaintiffs' equitable claims. *See, e.g.*, *Mile High Indus. v. Cohen*, 222 F.3d 845, 857 (10th Cir. 2000) ("Our appraisal of the general nature of [the plaintiff's equitable] foreclosure claim and Mr. Cohen's defenses shows [the defenses] related directly to the basic issue of foreclosure, as initially raised in the pleadings, leaving us with the firm conviction the issues involved here are the sort traditionally enforced in equity."); *Shubin v. U.S. Dist. Court*, 313 F.2d 250, 251–52 (9th Cir. 1963) (holding that defendants were not entitled to a jury trial on compulsory counter-claims where the "only issue under the existing pleadings, admissions and stipulations" was equitable, even though the claims could have raised legal issues under other circumstances). As the Ninth Circuit has observed, an "equitable claim may involve a legal issue of fact, or may turn on a question of fact. The existence of an issue of fact does not per se create a 'legal claim.'" *Shubin*, 313 F.2d at 251.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting.  The basic claims by the plaintiff sisters against their brothers, Dennis and Griffy, have been litigated since the sisters first sued the brothers 27 years ago.  I do not agree with my colleagues' disposition of this case because:  (1) the parties settled the same basic claims in 1993; (2) even if the claims are not completely barred by the settlement agreement, the claims are equitable in nature and the doctrine of laches should foreclose damages after a reasonable time following the time when the sisters learned of their brothers' earlier breach of fiduciary duties; (3) under any circumstances, the damages ($584 million, nearly half of which are in the form of prejudgment interest at 8% compounded annually for approximately three decades) approved by our court are excessive, unreasonable, and probably in violation of due process.

## I.

A very simple point should end this litigation:  Between 1990 and 1993, the parties before us now litigated the very same claims presented in this case now—25 years later.  The 1990 action was a stockholder's derivative suit; it claimed that the brothers engaged in fraud, breach of fiduciary duty, and misconduct as chief officers of the corporation created by their father.  The sisters' claims arose from the same basic facts presented in this case.  The major difference is that the corporation was much smaller 25 years ago, less valuable, and had not been sold.  The record does not reveal what the circumstances of the corporation were a generation ago or what led to the increase in value to $840 million.  The sisters and their families have apparently already received some monies as a result of the sale.

The plaintiff sisters and the defendant brothers settled their lawsuit in September 1993, and the parties—including each of the sisters—signed the settlement agreement.  The settlement agreement clearly releases the brothers in exchange for consideration.  The brothers brought pressure to bear on their sisters by paying them money and demonstrating anger and sorrow about the family disagreement.  In exchange for $10,000 each, the sisters released "any and all

claims . . . of any kind or nature whatsoever which any of the Griffin siblings may have had or may now have, regardless of whether known or unknown," against the two brothers.  The district court immediately conducted a fairness hearing on the settlement agreement and contemporaneously concluded that the settlement was fair.  It approved the settlement and entered judgment dismissing the plaintiffs' claims with prejudice.

My colleagues argue 25 years later that the settlement agreement is unenforceable because the defendant brothers' anger violated fiduciary duties that continued even after the litigation.  My colleagues apparently believe that the brothers had a fiduciary duty to encourage the sisters to reject the settlement offer "precisely because [the sisters] continued to trust them." This so-called brotherly "fiduciary duty" to discourage settlement between litigating parties is indeed strange since the parties were engaged on opposite sides of a lawsuit in which the sisters claimed serious wrongdoing by the brothers.  The law normally encourages the settlement of lawsuits.  *See* Fed. R. Civ. P. 16(a)(5) (concerning "facilitating settlement"); Fed. R. Civ. P. 16 advisory committee's notes (citing extensive authorities that encourage settlement); *In re NLO, Inc.*, 5 F.3d 154, 157 (6th Cir. 1993).  The parties here were adversaries in court, not fiduciaries. The fact that 25 years later the corporation is worth hundreds of millions of dollars more in the marketplace is not a valid basis for setting aside an agreed-upon and judicially approved settlement agreement many years later.  The settlement agreement 25 years ago arising from the same basic claims should, therefore, stand as a bar to these claims.  My colleagues' rule would make it impossible to settle breach-of-fiduciary-duty lawsuits once they are filed—a rule directly contrary to the normal policy of the law encouraging settlement.

In deciding this case, we must remember that hundreds of thousands of settlements every year terminate legal disputes.  This court and other trial and appellate courts at the federal and state level employ settlement lawyers who seek to settle cases.  Lawyers themselves, outside of the judicial process, settle many disputes before they become lawsuits.  Settlements often depend on significant pressures to settle brought to bear by judges, mediators, adversaries, family members, the press and many others.  Here, a federal judge intervened to conduct a fairness hearing and to put his seal of approval on the settlement.  The elder brothers may have brought pressure to bear on their sisters—by paying them each $10,000 or by exhibiting anger or

sorrow—but I do not find anything that would justify refusing to enforce the settlement several decades later. There must be hundreds of thousands of cases in which similar types of pressure induced settlement. *See* John Barkai & Elizabeth Kent, *Let's Stop Spreading Rumors About Settlement and Litigation: A Comparative Study of Settlement and Litigation in Hawaii Courts*, 29 Ohio St. J. Disp. Resol. 85, 135-39 (2014) (estimating between 50% and 60% of lawsuits are settled nationwide). In my view, my colleagues' holding here establishes a very bad precedent that the judicial system cannot live with if applied elsewhere.

The alternative arguments below apply only if the settlement agreement is not dispositive of the case. In my view, the settlement agreement should be enforced. In that case, the two alternative arguments below need not be considered and should be pretermitted.

## II.

The district court should have applied the doctrine of laches in this case. That doctrine significantly reduces the long period for which the district court awarded damages, including its award of interest at 8% compounded annually for decades.

The plaintiff sisters' action against their brothers was an equitable proceeding for breach of fiduciary duty arising from the brothers' conduct as trustees of their father's family trust after their appointment in November 1985. In such equitable proceedings, the more flexible doctrine of laches applies rather than the strict rules governing statutes of limitation. Kentucky's highest court has established the following more flexible standard for laches:

> Ordinarily, actual knowledge on the part of the complainant, of the alleged invasion of his rights of which he complains, is necessary in order to charge him with laches. However, knowledge may in some circumstances be imputed to him by reason of *opportunity to acquire knowledge*, or where it appears that he could have informed himself of the facts by the exercise of *reasonable diligence*, or where the circumstances were such as to put a man of *ordinary prudence* on inquiry.

*Taylor v. Kentucky*, 302 S.W.2d 583, 584 (Ky. 1957) (emphasis added).

The district court's own findings when it dismissed the plaintiff sisters' RICO claim should be conclusive on the issue of laches. With regard to the same conduct, the district court

found that the sisters had an "opportunity to acquire knowledge" of the brothers' wrongful conduct and that the sisters had failed to exercise "reasonable diligence" regarding the warnings that they had received regarding the brothers' conduct as trustees.  The district court concluded that the plaintiffs had many opportunities to "acquire knowledge" of their brothers' breach of fiduciary duty and that they were on notice of facts that would "put a man [or woman] of ordinary prudence on inquiry."  The district court found as a fact that "the *Holt* plaintiffs were aware that [their sister] Betsy had filed a lawsuit against Dennis and Griffy just months before the closure of [their] Mother's probate estate."  The district court went on to say that "even accepting plaintiffs' contention that Dennis and Griffy dissuaded them from inquiring into the substance of Betsy's claims—which itself should arguably have alerted plaintiffs to the possibility that Dennis and Griffy were being less than candid with them—it is undisputed that plaintiffs could easily have obtained Betsy's complaint, which was a public record from the time of its filing . . . ."  The district court found that plaintiffs were at fault because "they admittedly took no action, however, to look into the matter further, even after defendants demanded that they sign the 1993 settlement agreement [for Betsy's and their own derivative case] without disclosing its terms."

There were additional reasons as well that the sisters should have been on notice that the brothers were not treating them fairly.  The sisters claim that Dennis threw a copy of their mother's will at them, refused to answer questions about their mother's estate, and refused to let them see the settlement documents he directed them to sign.  Previously, in 1985, plaintiff Cynthia Roeder's husband told her and her sister, Betsy, that they were being "screwed" by the brothers.  Betsy repeatedly warned the *Holt* plaintiffs to obtain copies of their mother's estate documents.  Nevertheless, the sisters remained willfully ignorant of their brothers' conduct.

Had the sisters insisted that they be shown the 1993 settlement agreement they signed, they would have read that the purpose of the agreement was "[t]o settle the derivative claim against Griffin Industries in the Lawsuit and any tort claims that could have been asserted by the Griffin Siblings against Dennis Griffin, John M. Griffin and Robert Griffin based on [their] conduct in their capacities as officers and directors of Griffin Industries."  Similarly, the 1993 agreement provided:

> Although the Defendants deny any wrongdoing and liability to any of the Griffin Siblings, the Defendants acknowledge that the pleadings in the Lawsuit alleged tort claims against Dennis Griffin and John M. Griffin based on their conduct in their capacities as officers and directors of Griffin Industries and that such conduct is alleged to have resulted in personal injury and caused consequential damages . . . .

These provisions of the settlement agreement make clear that Betsy's original suit accused Dennis and Griffy of tortious malfeasance in their capacities as directors of Griffin Industries. It seems to me that "reasonable diligence" would have required the sisters to insist upon being shown the text of the settlement agreement before signing it, especially in light of Dennis and Griffy's erratic behavior in connection with the administration of the mother's estate. Had the sisters examined the agreement, they would have learned of the nature of Betsy's claims against the brothers. Coupled with the brothers' behavior, those facts would have been sufficient to put a reasonable person on notice of his or her potential claims against the brothers.

If the enforcement of the settlement agreement does not end the case, I would vacate the judgment and remand the case to the district court with instructions to apply the doctrine of laches from September 10, 1993, the date that the *Holt* plaintiffs would have learned of the substance of Betsy's claims against Dennis and Griffy had they exercised reasonable diligence. Specifically, I would instruct the district court that the *Holt* plaintiffs had a duty to inquire into their brothers' conduct after they signed the 1993 settlement agreement and they received checks for $10,000 from Griffin Industries marked "derivative." That date represents the latest possible moment they could have reasonably relied upon their brothers' characterizations of the dispute with Betsy.

**III.**

The district court also failed to calculate the damages and the prejudgment interest in this case with the degree of specificity required under Kentucky law. Accordingly, I would remand the case for further fact-finding and reconsideration of both amounts if the settlement agreement is not enforced.

A.

With respect to its calculation of the damages associated with the defendants' breach of fiduciary duty, the district court erred in not reducing the plaintiffs' recovery by the amount that the brothers paid directly to the IRS in satisfaction of the tax liability associated with Griffin Industries' yearly earnings. I would remand the case for further fact-finding on that question.

"Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985) (quoting Restatement (Second) Contracts § 352). Kentucky's requirement of reasonable certainty does not require absolute mathematical precision when calculating an award of damages, but it does require that the finder of fact take cognizance of ascertainable facts that "eliminate virtually all the uncertain variables." *Id.* This rule squares with the "bottom principle of the law of damages" in Kentucky, which is that compensatory damages are designed "[t]o restore the party injured, as near as may be, to his former position." *Hughett v. Caldwell Cty.*, 230 S.W.2d 92, 96 (Ky. 1950), *abrogated on other grounds by Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290 (Ky. 2015).

The district court's damages calculation does not meet this standard of specificity in light of its failure to account for disbursements that were made to Griffin Industries' stockholders to cover the tax liability associated with Griffin Industries' earnings as a subchapter-S corporation. The evidence at trial showed that Griffin Industries has elected to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code at all relevant times. So-called "S corporations" are taxed at the shareholder level as opposed to the corporate level. Put another way, the S corporation does not pay taxes on its yearly earnings; rather, its shareholders are responsible for paying the taxes associated with the corporation's earnings. According to expert testimony at trial and consistent with the common practice of S corporations, Griffin Industries would make annual disbursements to its shareholders in order to cover the tax liability associated with the corporation's earnings for the year; the shareholders would then forward those disbursements directly to the Internal Revenue Service. Despite the fact that the plaintiff sisters would have been required to send all tax-related disbursements along to the IRS, the district court calculated the damages on the basis of *all* disbursements made between 1985 and 2010 without accounting

for or seeking proof regarding the portion of those disbursements that were made in satisfaction of Griffin Industries' tax liability. Indeed, the district court specifically refused to consider evidence of taxes paid by Griffin Industries stockholders over the relevant time period. After a cross-examination of the plaintiffs' damages expert about his failure to account for the disbursements that were made to the shareholders to satisfy their tax liability on Griffin Industries, the district court squarely held that it "would not make any attempt to figure out everybody's taxes" despite the defendants' request that the court account for the disbursements made to cover the stockholders' tax liability on the S corporation. The district court's failure to consider proof of the tax liability resulted in a windfall to the plaintiffs; they were awarded compensation (and 8% interest over 30 years) for disbursements that would not have inured to their benefit even absent the defendants' breach of fiduciary duty.

I would hold that the district court's damages award has not been established with the "reasonable certainty" required under Kentucky law because it does not include an offset for the money that the sisters would have been obliged to remit to the IRS. Accordingly, I would remand the case for further fact-finding regarding the proportion of the disbursements that were made in order to satisfy Griffin Industries' tax liability between 1985 and 2010 if the settlement agreement is not enforceable.

B.

The district court also abused its discretion in awarding prejudgment interest on unliquidated damages at the highest rate authorized by law over a period of nearly thirty years. I would reverse the district court's decision to award prejudgment interest.

In cases involving unliquidated damages, the award of prejudgment interest rests within the discretion of the trial court. *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 145 (Ky. 1991). Kentucky law disfavors—but does not disallow—the award of prejudgment interest in cases involving unliquidated damages. *See* Ronald W. Eades, *Kentucky Law of Damages* § 7:9 (2017). To that end, the highest court in Kentucky has repeatedly cautioned that it is an abuse of discretion to award prejudgment interest on unliquidated claims for time before the damages are "ascertainable." *Tri-State Developers, Inc. v. Moore*, 343 S.W.2d 812, 817 (Ky. 1961). In broad

strokes, damages are not "ascertainable" until the defendants have notice of the final amount of damages associated with their alleged breach. *See id.* (holding damages associated with a late and over-budget construction project were not "ascertainable" until the contractor had finished construction on the project). This limitation on prejudgment interest is especially important when, as here, the plaintiff has "delayed in filing suit." *Nucor Corp.*, 812 S.W.2d at 144 (quoting Restatement (Second) of Torts § 913 cmt. a).

Here, the damages were not "ascertainable" until 2010, when the sisters filed their claims in the district court. The damages associated with Dennis and Griffy's wrongdoing accrued on an ongoing basis under the district court's chosen remedy of "equitable disgorgement,"[1] so the precise amount of the damages in this case remained unknown until the plaintiffs filed their claims against the defendants. In that way, the facts here are analogous to those in the *Tri-State Developers* case decided by Kentucky's highest court. In *Tri-State*, the Court of Appeals of Kentucky rejected a plaintiff's claim that the damages associated with a late and over-budget construction project were ascertainable before the completion of the project. *Tri-State Developers*, 343 S.W.2d at 817. The court supported its finding on nonascertainability by reasoning that the defendants could not have anticipated the amount of the judgment against them—and, consequently, their liability for prejudgment interest—until they completed the project. *See id.* Similarly, the defendant brothers could not have anticipated the size of the judgment in this case until 2010 at the very earliest. Thus, the damages in this case were not ascertainable until 2010 and the district court's award of hundreds of millions of dollars in

---

[1]The idea of "equitable disgorgement" is a doctrine of a very recent vintage used in SEC fraud cases, primarily in the Second Circuit. *See SEC v. Cavanagh*, 445 F.3d 105, 116-20 (2d Cir. 2006). The doctrine is used to remove unlawful gains from insider traders because such cases do not cause damages to any discrete plaintiffs. The theory is not applicable to cases of this kind in which there are identifiable victims with a right to recover damages. Indeed, the theory may not even be applicable in SEC contexts for much longer in light of the Supreme Court's recent opinion on the matter. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1642 n.3 (2017) ("Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context.").

I am glad my colleagues are happy to stand with Lord Coke, Blackstone, Justice Story, and other distinguished lawyers on this matter, but those famous men would never have heard of "equitable disgorgement." Rather, they would have understood that the Lord Chancellor retained power to award money damages in cases involving a breach of fiduciary duty. *See* Colleen P. Murphy, *Misclassifying Monetary Restitution*, 55 SMU L. Rev. 1577, 1598-1600 (2002).

prejudgment interest for the preceding 25 years was an abuse of discretion under Kentucky law. I would reverse the district court's award of prejudgment interest for the time prior to 2010.

**IV.**

Finally, I am skeptical of the constitutionality of the district court's award of prejudgment interest in excess of $250 million on a compensatory award of approximately $330 million. This case raises due process concerns because the circumstances suggest that the award of prejudgment interest was intended more to punish the defendants than to compensate the plaintiffs for the time-value of the disbursements involved in this case. Indeed, the district court recognized that applying an 8% annual return "would probably be higher" than returns on the market over the 30 years before its judgment, noting that "a treasury bill [was then] paying one percent." Despite its recognition of that fact, the court awarded interest at the 8% level used by the plaintiffs' expert without any explanation or effort to determine "the market rate of interest" over the same period. It seems clear that the district court intended to do more than compensate the sisters for the time-value of their damages awards when it applied an 8% prejudgment interest rate, so I presume the award of prejudgment interest was intended, at least in part, as a sort of punishment for the defendants' wrongful acts.

Civil damages awards imposed as punishment for a defendant's wrongful actions are subject to scrutiny under the Due Process Clause of the Fifth Amendment.**[2]** *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-18 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). Specifically, the Constitution prohibits the imposition award of "grossly excessive or arbitrary" punitive damages. *Campbell*, 538 U.S. at 416-17. When assessing whether an award of damages is grossly excessive or arbitrary, courts examine the three "guideposts" set out in *Gore*: First, and most importantly, courts assess "the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Second, we examine the ratio of the compensatory damages award to the punitive damages award. *Id.* Third, we compare the punitive damages award to "civil penalties authorized or imposed in comparable

---

**[2]**The Supreme Court has never expressly held that the same due process standards articulated under the Fourteenth Amendment are applicable to the federal government under the Fifth Amendment, but the clear language and reasoning of *Gore* and *Campbell* suggest that the same standards should govern a federal court's award of damages as punishment for a defendant's wrongful conduct.

cases." *Id.* None of these factors is dispositive; rather, they are balanced against one another in determining whether an award of punitive damages is grossly excessive.

Assuming that the same standard is applicable in a case where ostensibly compensatory remedies are used to punish the defendant rather than to compensate the plaintiff, I am skeptical that this award comports with due process. While it is true that the brothers' abuse of their sisters' trust was wrongful, it is also true that the sisters did not exercise the diligence we expect of reasonable people when it came to protecting their interests after they were informed of Betsy's grievances with Dennis and Griffy. The ratio between the compensatory damages and the punitive damages in this case is particularly troublesome. On an award of $330 million in damages, the plaintiffs recovered nearly the same sum in prejudgment interest. The Supreme Court has previously noted that in cases, like this one, involving extremely high compensatory awards, imposition of punitive damages at even a 1-to-1 ratio can be constitutionally problematic. *Campbell*, 538 U.S. at 425. The final *Gore* factor does not weigh in favor of a finding of unconstitutionality as Kentucky law permits imposition of a civil monetary penalty of up to double the defendant's gain in a case involving felony theft by deception. Ky. Rev. Stat. §§ 514.040 (defining theft by deception), 534.030 (setting default monetary fines in felony cases) (2017). While these factors appear to be largely in equipoise, the comparative size of the judgment compared with the award of prejudgment interest coupled with the sisters' failure to exercise reasonable diligence leave me doubtful of the constitutionality of the district court's award of prejudgment interest.

For the reasons articulated above, I respectfully dissent.